NOTICE
Decision filed 01/21/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180277-U

NO. 5-18-0277

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 15-CF-1085 |
| | ) | |
| LAMARC R. GARRETT, | ) | Honorable Randall W. Kelley and |
| | ) | Honorable Stephen P. McGlynn, |
| Defendant-Appellant. | ) | Judges, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Boie and Justice Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: Because the circuit court did not, in response to the defendant's posttrial *pro se* assertions of ineffective assistance of counsel, conduct adequate proceedings pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny, we remand, with directions, for the circuit court to do so.

¶ 2    The defendant, Lamarc R. Garrett, appeals his conviction and sentence after a jury trial in the circuit court of St. Clair County in which he was found guilty of one count of first degree murder and subsequently was sentenced to serve 65 years in the Illinois Department of Corrections, followed by 3 years of mandatory supervised release. For the following reasons, we remand with directions for the circuit court to conduct proper *Krankel* proceedings with regard to the defendant's assertions of ineffective assistance of trial counsel.

1

¶ 3                                I. BACKGROUND

¶ 4     On October 2, 2015, the defendant was indicted on one count of first degree murder. The indictment charged that on or about September 5, 2015, the defendant shot the victim in the chest, causing the death of the victim. On November 9, 2015, the judge who was then presiding over the case entered an order in which the judge stated that the defendant's trial counsel had raised "a *bona fide* doubt as to [the defendant's] ability to understand the nature of the charge against him, to plead guilty or to stand trial, and cooperate in his own defense." The order appointed Dr. Daniel Cuneo to evaluate the fitness of the defendant to stand trial.

¶ 5     On February 4, 2016, a status hearing was held. At one point during the hearing, the judge addressed the defendant directly, asking, "do you think you know what's going on here?" The transcript of the hearing states that the defendant "indicated no." The judge then asked, "Dr. Cuneo—Do you remember talking to Dr. Cuneo?" The transcript again states that the defendant "indicated no." Following the hearing, the judge entered an order in which he noted that the parties stipulated to the expertise of Dr. Cuneo, and in which he noted that the parties were in receipt of a report from Dr. Cuneo, dated January 18, 2016, in which Dr. Cuneo found that the defendant was "presently unfit to stand trial," but that if the defendant was "provided with a course of inpatient treatment," there existed "a substantial probability" that the defendant would "be able to attain fitness within one year."

¶ 6     Dr. Cuneo's January 18, 2016, report, which is included in the record on appeal, noted that Dr. Cuneo conducted two interviews of the defendant, consulted clinical records from the St. Clair County jail, spoke with nursing staff at the jail and with other jail staff, and spoke with the defendant's mother "to gather additional information about her son." When Dr. Cuneo asked the defendant a question during his first attempt to interview the defendant, the defendant "simply stared blankly ahead." Dr. Cuneo noted that the defendant "never spoke during my first attempt to

2

assess him and would only shake his head or shrug," which was consistent with behavior the defendant had exhibited at the jail, as observed by jail staff. While incarcerated at the jail, the defendant had "been in and out of the Quiet Room at the jail and ha[d] gone from mutism to mania." The defendant "refused to give [Dr. Cuneo] any information," including about relatives. Dr. Cuneo eventually obtained information about the defendant's mother, who subsequently "stated that her son had been diagnosed with paranoid schizophrenia and that he was 'getting a shot' to control his psychosis." The defendant's mother informed Dr. Cuneo that the defendant "had been seeing a psychiatrist in St. Louis," and that the defendant had "been placed on the psychiatric wing when he had been at the Jefferson City Correctional Facility." She also informed Dr. Cuneo that the defendant had "times when she visits him that he will simply stand mute and refuse to respond. Other times he will respond to her and complain of voices and people out to get him."

¶ 7     The second time Dr. Cuneo attempted to interview the defendant, which was on January 18, 2016, the defendant initially "would only respond by shrugs." After Dr. Cuneo told the defendant that he had spoken to the defendant's mother, and that she had said that the defendant should talk to Dr. Cuneo, the defendant eventually began to respond. Dr. Cuneo's report noted that the defendant's Mental Status Exam "revealed [the defendant] to be oriented only to person and not to place or time," which meant that the defendant "knew who he was, but he was unable to tell [Dr. Cuneo] where he was or the correct month or year." When asked where he was, the defendant "shrugged that he did not know," then, "when pushed," the defendant "mumbled that he was in St. Louis, but he was unsure what state he was in." Dr. Cuneo noted that the defendant "could tell me that the day of the week was Monday, but he shrugged that the month was February and that the year was 1987." Dr. Cuneo asked the defendant if he ever experienced any type of hallucinations, to which the defendant "shrugged his head 'yes,' " then, again "when pushed," the defendant

3

"mumbled that he hears 'bad stuff, good stuff, I don't know.' " The defendant "later mumbled that these voices tell him to kill others and to kill himself," and the defendant told Dr. Cuneo that the defendant "had attempted to kill himself once by hanging himself when he was in prison." Dr. Cuneo characterized the defendant's thinking as "delusional," with the delusions being "paranoid in nature." Dr. Cuneo reported that the defendant "mumbled how people 'were out to get him every day.' " The defendant's "thinking was extremely impoverished and there appeared to be thought blockage," as well as "long pauses both in and between his responses."

¶ 8 Dr. Cuneo reported that although "no formal intellectual testing was done," the defendant "appeared to be functioning no higher than the Dull Normal Range of Intelligence." When asked how far he had gone in school, the defendant "shrugged that he did not know. When pushed, he mumbled sixth grade and could not tell *** the name of the school." The defendant's mother reported that the defendant "had gone to University High School and had dropped out in either the tenth or eleventh grade," although she did not know why he had dropped out. Dr. Cuneo reported that the defendant's "memory, both short and long term, was impaired," and that the defendant "could only repeat back accurately three numbers forward and three numbers backwards," and "could not give any type of history." Dr. Cuneo reported that the defendant's "affect was flat and he often would simply respond by shaking his head or shrugging his shoulders." Although the defendant denied any type of alcohol use, when asked about his use of drugs, the defendant "mumbled, 'Head drugs.' When pushed on what he meant, he mumbled, 'Got them at head store.' " Dr. Cuneo noted that the defendant's records indicated that during his jail admission interview, the defendant "stated that he used crack cocaine, PCPs, and marijuana on a regular basis." Dr. Cuneo reported that when he asked the defendant about the defendant's past mental health treatment, the defendant "would only mumble, 'Shot,' " and then "shrugged that he could not remember who had treated him or the name of the medication."

4

¶ 9    Dr. Cuneo noted that while incarcerated at the jail, the defendant was receiving Haldol, Cogentin, and Zoloft, and Dr. Cuneo stated that his diagnosis for the defendant was "Schizophrenia, Cannabis Use Disorder in a Controlled Environment, Cocaine Use Disorder in a Controlled Environment, Phencyclidine Use Disorder in a Controlled Environment, [and] Borderline Intellectual Functioning." Dr. Cuneo opined that the defendant's mental illness substantially impaired the defendant's "ability to understand the nature and purpose of the proceedings against him and his ability to assist in his own defense," that the defendant was "disoriented as to place and time," and "was unable to tell [Dr. Cuneo] where he was and did not know the year or month." The defendant could not describe "what he was charged with and thought he was in a jail in St. Louis." The defendant could not describe why he was jailed, "could not grasp the roles of a public defender or state's attorney due to his very impoverished thinking," and "could not cooperate with his attorney in any meaningful manner, much less assist in his own defense due to his exreme [*sic*] cognitive confusion." Dr. Cuneo noted that the defendant's "attention span is so limited that he could not follow the court proceedings," and that, accordingly, in Dr. Cuneo's opinion, the defendant was "presently unfit to stand trial." Dr. Cuneo noted that he believed that if the defendant "were provided with a course of inpatient psychiatric treatment and stabilized on psychotropic medication," there then existed "a substantial probability that [the defendant] would be able to attain fitness within the course of one year."

¶ 10    On June 2, 2016, the judge entered an order in which he noted that the parties stipulated to the expertise of Dr. Rajendra Gupta of the Alton Mental Health Center, and in which he noted that the parties were in receipt of a report from Dr. Gupta, dated May 18, 2016, in which Dr. Gupta found the defendant was still unfit for trial, but that there existed a substantial probability that the defendant would "attain fitness for trial within the one-year statutory limit." The report, which is also included in the record on appeal, listed one of the defendant's "[d]eficits" as "a history of non-

5

compliance with medication." The report noted, *inter alia*, that the defendant was "currently verbalizing the following symptoms: hallucinations, impaired memory, history of self injurious behaviors, history of sexual abuse, and paranoia."

¶ 11 On September 13, 2016, the judge entered an order in which he noted that the parties stipulated to the expertise of Dr. Nageswararao Vallabhaneni, a psychiatrist at the Chester Mental Health Center, and in which he noted that the parties were in receipt of a report from Dr. Vallabhaneni, dated July 29, 2016. The report, which likewise is included in the record on appeal, reiterated that the defendant was still unfit for trial, and that the defendant continued to be treated with "psychotropic medication" in an effort "to control the psychotic symptoms including paranoid delusions." Dr. Vallabhaneni noted, however, that he believed the defendant had "not cooperated well" in terms of making progress toward attaining fitness. Dr. Vallabhaneni opined that there existed "no strong evidence that he is clearly suffering from active psychotic symptoms like hallucinations and paranoid delusions," and held out the possibility that the defendant was "malingering" or faking illness. He noted that the defendant "did not participate in treatment plan reviews well," was "not willing to take the fitness test," and posited that there "seems to be a strong element of either deception or refusal to cooperate or give the right answers to the questions on the test." As a secondary diagnosis, he listed "Anti-Social Personality Disorder."

¶ 12 On October 24, 2016, the judge entered an order in which he noted that the parties had "received a report from [the Chester Mental Health Center] indicating that the defendant ha[d] attained fitness." This report, which is also included in the record on appeal and also authored by Dr. Vallabhaneni, contained much information that appears to have been copied and pasted from Dr. Vallabhaneni's July 29, 2016, report, but also stated that there had been "significant changes" since that report. The new report indicated that the defendant "took a full fitness test on his own with his therapist present during that time," with the test dated September 22, 2016. The report

6

indicated that the defendant "took the test willfully and he performed extremely well without any assistance." The defendant scored 100% on the test, which Dr. Vallabhaneni opined "not only indicates his cooperation, also his level of performance, understanding of his current charges and his understanding of various court proceedings." Dr. Vallabhaneni added that the defendant presently had "no clinical indication or reason for remaining unfit to stand trial." He added, however, that the defendant still had problems with cooperating with Dr. Vallabhaneni and staff on working toward his fitness goals, which Dr. Vallabhaneni attributed to a desire on the part of the defendant "to not return to the court." He noted that since the July 29, 2016, report, the defendant had "maintained his behavior without having any difficulties," and "was not seen as being clearly psychotic, meaning delusional or depressed." He further noted that the defendant "was medication compliant and in fact wanted to remain on medication," because the defendant "thought that without medication he would lose control and act out." Dr. Vallabhaneni stated that "[f]or that reason, this writer did not intend to change any of his medications; the focus was more on his legal matters and fitness issues." In several places in the report, he referred to the defendant's cooperation with his treatment team as being "selective," and noted that most of the defendant's communication was still nonverbal, consisting of shrugs, body gestures or language, and short "yes" or "no" answers rather than longer verbal explanations. Dr. Vallabhaneni stated that until further evidence was available, the defendant's diagnosis was still "Schizophrenia Paranoid," with a secondary diagnosis of "Anti-Social Personality Disorder," but reiterated that even while on medication, the defendant was fit to stand trial and assist with his own defense. He specifically wrote: "Overall, it is this writer's impression that [the defendant] is not suffering from any acute psychotic symptoms; however, the diagnosis has not been changed which itself, including the psychotropic medication that he has been receiving, had no direct impact on his ability to understand his legal matters including the charges and ability to participate in legal proceedings."

7

He concluded his report by noting that the defendant was continuing "the same treatment including his current antipsychotic and other medications as prescribed," and was "fully compliant with treatment and *** not experiencing any adverse effects from this treatment." Documents that accompanied the report included various case notes written by Dr. Vallabhaneni and other members of the defendant's treatment team, and the fitness tests the defendant had taken or refused to take during his treatment.

¶ 13 On the following day, October 25, 2016, the judge entered an order appointing Dr. Cuneo, on the motion of the defendant, to evaluate the defendant's "sanity at the time of the offense, and whether he would qualify for a guilty-but-mentally-ill plea." The order specified that because Dr. Cuneo was being appointed as an expert witness for the defense, Dr. Cuneo's report would be provided to the defendant's trial counsel only. A subsequent order reserved ruling on the separate question of the defendant's fitness to stand trial. No report regarding the defendant's "sanity at the time of the offense, and whether he would qualify for a guilty-but-mentally-ill plea"—whether from Dr. Cuneo or any other expert—is contained in the record on appeal.

¶ 14 On December 29, 2016, a status hearing was held before the Honorable Randall W. Kelley, who was assigned to the case after the judge who was previously assigned to it ended his service on the bench. Judge Kelley presided over the case for all of the subsequent trial court proceedings to and including the defendant's sentencing hearing. At the December 29, 2016, hearing, the defendant's trial counsel stipulated that the defendant was fit to stand trial. Following the hearing, the trial judge entered an order finding the defendant fit to stand trial and setting a date for a jury trial. Shortly before the jury trial, the defendant requested permission to "fire" his public defenders, claiming that they had "no defense" for him. The trial judge noted that both of the defendant's attorneys were highly competent and denied the defendant's request. Following the defendant's jury trial—the contents of which are not relevant to this appeal—the defendant was found guilty

on August 2, 2017, of first degree murder, and was found to have personally discharged the firearm that caused the death of the victim. His attorneys filed a posttrial motion.

¶ 15 On September 12, 2017, a hearing was held on the posttrial motion filed by the defendant's attorneys. At the hearing, they argued that during jury deliberations, evidence was inadvertently provided to the jury about a firearm and ammunition that were found on the person of the defendant at the time of his arrest, but that were not consistent with the firearm used in the murder, which potentially prejudiced the jury against the defendant, and which the parties had agreed, prior to trial, to keep from the jury. The State did not object to the defendant's factual characterization or argument, and in fact stated that it had "no objection to the [c]ourt granting the post-trial motion." The trial judge thereafter entered an order in which he set aside the jury verdict and granted the defendant a new trial.

¶ 16 The defendant's second trial—the result of which led to this appeal—began on February 5, 2018. Witness testimony began on February 6, 2018. Because it is not relevant to the issues raised by the defendant in this appeal, we need not consider the substance of the witness testimony in detail, other than to state that, from a strictly factual point of view and aside from questions of the defendant's mental state at the time of the murder and at the time of trial, the evidence—including video footage and photographs—overwhelmingly showed that the defendant committed the acts that caused the death of the victim.

¶ 17 Of significance to this appeal, during the course of the State's presentation of its case in chief late on the morning of February 6, 2018, the defendant began a series of interruptions and disruptions that are related to the issues raised in this appeal. The defendant attempted to pose objections and made derogatory comments about the proceedings, the parties, the judge, and witnesses. The judge attempted to calm the defendant, at one point stating, "you do want to stay for the rest of your trial, don't you?" He assured the defendant that the defendant would have the

9

opportunity to present his case, which appeared to temporarily appease the defendant. However, shortly thereafter, the defendant began to interrupt again. The judge again attempted to intervene and told the defendant that the defendant had the right to be present "for every minute of this trial," unless the defendant chose not to be present. The defendant then repeatedly stated that he did not wish to be present, and he was taken from the courtroom. At the request of the defendant's trial attorneys, the court went into recess, and the jurors were allowed to break for lunch.

¶ 18 Following the break, and outside the presence of the jury, the parties and the judge agreed to recess the proceedings until the following morning. The judge then addressed the defendant at length, noting that the defendant had not previously had behavioral issues in the judge's courtroom, and asking the defendant, "Do you feel like you have any needs or desires to talk to Dr. Cuneo before we start up again?" The defendant responded, "I have a need and a desire to hire myself as my own attorney." The judge assured the defendant that they would discuss that the following morning. The defendant was thereafter taken from the courtroom, and a discussion continued between the judge, the State, and the defendant's attorneys. One of the defendant's attorneys stated, with regard to the displeasure the defendant had voiced with regard to their representation of him, that "my one hesitation would be he's basically shut down in wanting to talk to us mid-trial." The judge replied, "We'll see where we are in the morning." The judge thereafter added, "For the record, the Court has been advised that [the defendant] generally takes certain medications every morning and was not administered those medications this morning. And so, we're going to wait and see what tomorrow brings." One of the defendant's attorneys replied that he wished to make a record "that until today, there—even leading up to today, there had been no instances that would have led us to believe that we would be in this situation." The judge agreed, then added, "I don't want to just pull the plug on everything at this point." The jurors were thereafter summoned and excused for the day.

¶ 19 The following morning, February 7, 2018, proceedings began, outside the presence of the jury, with the defendant's attorneys reporting that they had "attempted to speak with" the defendant, but that the defendant was "refusing to speak with us." The judge then attempted to engage the defendant in conversation, but the defendant mostly responded nonverbally, with what the transcript characterizes as shaking or nodding his head "yes" or "no." The judge admonished the defendant that "if you become disruptive or threatening to anybody in any fashion, I certainly have the authority and I will remove you from this proceeding and continue your trial without your presence." Thereafter, counsel for the State stated that, "just, I guess to clarify *** [i]t's my understanding that the defense has no issues as to fitness of the defendant." The judge responded, "The Court has a prior report from Dr. Cuneo that indicates that [the defendant] is fit to stand trial. So, we're proceeding on that."[1] The judge ordered that all physical restraints be removed from the defendant prior to the jury entering the courtroom, stating that "there's nothing to suggest that he made or threatened any physical harm to himself or anyone else," and finding that "restraints at this time are not necessary." The judge did not make a record of whether the defendant had been administered his medications that morning.

¶ 20 The jury returned to the courtroom and the testimony of witnesses resumed. Shortly thereafter, so did the interruptions and disruptions of the defendant. After the second interruption, the judge admonished the defendant to "[b]e quiet." After several more sporadic and short comments from the defendant on the proceedings, the defendant began to engage in longer and more frequent commentary, which the judge for the most part ignored. Finally, following an interruption, the judge stated to the defendant, "you've been admonished previously not to be disruptive. I've allowed you to carry on for a while." The defendant replied, "Oh." The disruptive

---

[1]The record on appeal contains no report from Dr. Cuneo that states that the defendant was fit to stand trial. The record contains only the aforementioned report to that effect from Dr. Vallabhaneni.

11

commentary from the defendant temporarily ceased, then began again. Throughout the course of the day's testimony, the defendant commented dozens of times, most of which the judge continued to ignore. At one point, the judge stated to the defendant, "I don't want to have to stop you from participating." The defendant's disruptive commentary continued. The judge thereafter stated to the defendant, "there's a Supreme Court case *** that sets forth the parameters that I need to follow as far as my discretion in allowing a defendant or a witness to continue to act out and be disruptive." He added, "I've greatly exceeded the parameters that I would be limited to. So, just as a fair warning, you either got to tone it down much more—much less frequently, I should say, or I'll have to take other measures." The defendant's disruptive commentary, utterings that are characterized in the transcript as "inaudible," and laughter continued. After the defendant accused one of the witnesses of "probably" having committed the murder, the judge stated to the defendant, "you're perilously close." The disruptions continued.

¶ 21    After the State rested its case, the judge asked the defendant, outside the presence of the jury, if the defendant wished to testify. When the defendant failed to respond, the judge asked again. When the defendant failed a second time to respond, the judge told the defendant that if the defendant did not respond, "I have to presume that's an indication that you do not want to testify in your own behalf." The defendant continued to fail to respond, despite the judge's additional repeated attempts to question the defendant. Thereafter, one of the defendant's attorneys agreed that the defense was resting. As the State presented its closing argument, the defendant began yet another series of interruptions and disruptions. The judge intervened, again admonishing the defendant that the judge could have the defendant removed from the courtroom. The defendant argued that he was now acting as his own attorney. The judge eventually ordered the defendant removed from the courtroom, and the trial continued without him.

¶ 22    Following closing arguments, as the judge began to instruct the jury, the judge stated that, "I must remind you that the defendant remains innocent until proven guilty at this time and throughout your deliberations. Whether or not the defendant is present in this courtroom should have no consideration by you in your findings that you will make." The judge added, "Additionally, I must admonish you that you shall not consider any interruptions or disruptions that may have been indicated by or caused by the defendant during the course of this trial proceeding." He told the jury, "None of that is relevant. None of that is evidence or testimony in this proceeding in any fashion." He reminded the jury that the defendant "remains, even though he's not present here in the courtroom, he remains innocent until you through deliberations would decide that the State has proved the defendant's guilt beyond a reasonable doubt." He added, "So, I don't want you to take anything from any of the—of the discourse between the defendant and myself or anyone else during the course of this trial as anything more than just that." He reiterated that "it's not evidence, it's not testimony, and it should not be considered either in favor of the defendant or certainly against the defendant." After deliberating for fewer than 30 minutes, the jury found the defendant guilty of first degree murder and found that the defendant personally discharged the firearm that caused the death of the victim.

¶ 23    On February 20, 2018, the defendant filed a posttrial motion, which was denied, following argument, at the outset of the defendant's sentencing hearing on February 26, 2018. At the sentencing hearing, the defendant's mother testified that when the defendant takes his medication, he is "humble" and "real calm," but that when he does not take his medication, he begins "moving too much." She stated that the defendant had struggled with mental health issues for "[a]lmost eight or nine years," but added that the defendant had "been like this all his life, but he just been on the medicine that long." She testified that she could tell when the defendant was not on medication, because he would not "be still when he not on it." She testified that on the date of the

13

murder, the defendant was not on medication. She added, "I told him he needed to get some rest, and he needed to go lay down. He wouldn't. And he was talking real reckless, so I know he wasn't on his medicine at the time." On cross-examination, she agreed with counsel for the State that, even with the "issues" she had discussed about her son's mental health, she believed her son knew "right from wrong."

¶ 24   The defendant's father testified that when the defendant "was on his medication, he was a total different person than without taking it." He testified that the defendant "explained" to him that "the night that this thing had transpired, he hearing voices in his head. He don't know what's going on." The defendant's father added, "He was diagnosed paranoid schizophrenic. If he ain't on his medication, how he going to know what's going on?" At the conclusion of the defendant's father's testimony, the defendant's father requested permission to address the judge directly, which the judge granted. The defendant's father stated, "I want to ask for the mercy of the court for my son because he—he not—he not—he not here mentally."

¶ 25   In argument, the State contended, *inter alia*, that the murder occurred because the "defendant was angry and this was not a psychiatric reason." The State pointed to evidence from trial that it suggested supported its position, stating, "This is not someone that has a psychiatric problem that is overreactive. This is someone that shot someone that he was mad at, killed him, and then tries to get rid of the vehicle and get rid of the evidence that would put him in the car." The State added, "There was nothing wrong with him. There was not any problem with his state of mind at the time." The State requested a sentence of 65 years' imprisonment.

¶ 26   The defendant's trial counsel argued, in mitigation, that the defendant "was suffering from a serious mental illness at this time. He's a diagnosed paranoid schizophrenic, and that is just the tip of the iceberg when it comes to his diagnosis." Counsel noted that the court had "Dr. Cuneo's fitness evaluation," and that the defendant "was unfit when he first got into the system," then

14

"spent a chunk of time at the Chester Mental Health Center," which counsel suggested "speaks to his state of mind as it was close to the time of this event." Counsel added, "We acknowledge that it doesn't rise to the level of a defense ***, but it's still a factor in mitigation."

¶ 27 Before delivering sentence, the judge stated that he was "considering in mitigation that the defendant suffers from a mental illness although the report from the court psychologist clearly indicated that the defendant was not controlled by that mental illness in such a state that he was unable to participate in his defense nor would it offer him a legal defense to these charges."[2] He added that, based upon his own observation of the evidence at trial, it was his opinion that "mental illness had little, if any, impact on the actions of the defendant." Thereafter, the judge sentenced the defendant to 65 years (including 25 years for personally discharging the firearm that caused the death of the victim) in the Illinois Department of Corrections, followed by 3 years of mandatory supervised release.

¶ 28 On March 7, 2018, the defendant's counsel filed a motion to reconsider sentence. On April 4, 2018, the defendant filed, *pro se*, a handwritten document in which, *inter alia*, he claimed he had received ineffective assistance of counsel at trial, and that Judge Kelley was biased against him. The defendant also claimed that the defendant was "incompetent," that his "mental played role," and that he "didn't get to testify." A hearing was held approximately two weeks later, on April 17, 2018. Because Judge Kelley had retired shortly after sentencing the defendant, the hearing was held before a different judge, who stated during the hearing that he had reviewed the existent court file in the case. The new judge (who, we note, is also no longer serving in the circuit court of St. Clair County) began the hearing by noting the defendant's *pro se* filing and stating that

_____

[2]It is not clear which report, if any, the judge was referring to. As noted above, there is no report in the record on appeal that opines with regard to whether the defendant's mental health might "offer him a legal defense to these charges."

15

it included "an allegation of ineffective assistance of counsel." The judge stated that accordingly he was going to begin by having "a hearing pursuant to *People v. Krankel*." The judge then explained the procedure he planned to follow to the defendant, stating that it would be a "a non-adversarial hearing to allow you to explain to me in your own words why you thought your counsel was ineffective." He added that the State would not participate, and that "[t]he attorneys that have been appointed to represent you in this case are also not to be allowed to come in and try to explain away why they might disagree with your assessment." He then stated to the defendant, "So, in your own words, why don't you tell me why you believe your defense attorneys were ineffective."

¶ 29   The defendant responded, "Because they didn't represent me in the right way," thereafter adding, "[d]uring the course of trial, both trials, they really worked more with the State than with me. It was—It was real bad." In response to questions from the judge, the defendant stated that he wished to call as a witness a psychiatrist the defendant had seen "on the street" but that he was not allowed to do so. The following colloquy then occurred:

"THE COURT: Did you have a defense of insanity?

THE DEFENDANT: Well, when I first—

THE COURT: Or guilty but—or sought a decision of guilty but mentally ill?

THE DEFENDANT: I didn't—I didn't—I didn't get to present anything at the present or then. But once I was—

THE COURT: Was this your second—

THE DEFENDANT: —first incarcerated in St. Clair, they sent me to the Mental Health Center, Psych Ward, Chester.

THE COURT: Was this the second trial of this case?

THE DEFENDANT: The first—

16

THE COURT: And did the Appellate Court remand it or was there—was there a new trial granted in a post-trial motion?

THE DEFENDANT: Well, I went before the first trial.

THE COURT: Yeah.

THE DEFENDANT: And that was through a different judge, before Kelley.

THE COURT: All right.

THE DEFENDANT: And then when I was at the treatment place, the counselors or caseworkers, or whoever was there, they kind of like tricked me into signing some papers that I really wasn't aware of what was going on at that moment, and they kind of coerced me into signing some papers that—something like they had some answers or something wrote down on it for me or something, and I didn't really get to read them. But I guess that was that I hadn't—

THE COURT: So, there was a—Previous in this case, there was—there was a hearing on your fitness to stand trial, was there not?

THE DEFENDANT: Yes.

THE COURT: Okay.

THE DEFENDANT: That's what I'm talking about now. I had—They had found not being able to stand trial at that time, and that's when they sent me to Chester.

THE COURT: All right. And after you received some treatment at Chestnut [*sic*], there was another hearing, and it was determined that you were fit to stand trial, is that correct?

THE DEFENDANT: I don't know about that treatment. But I know about the first one, though."

¶ 30    Thereafter, the judge asked the defendant if he had anything else to add about how his attorneys were ineffective. The defendant responded that, during his trials, his attorneys "didn't

17

object to anything that was wrong that the State presented" and "basically helped the State to convict me on charges—over charges." He complained that his attorneys refused to file motions he wished to file, lied to him, did not allow him to testify, and conspired with the State and with Judge Kelley to convict him. He stated that he believed he was "discriminated upon," and added that his conspirators "thought because of my mental health and lack of education that they can just like run over on me, and stuff like that." He concluded that "it's just—it's a real—it was real corrupted, a real corrupted courtroom." Immediately thereafter, the judge stated, "I think that listening to the defendant and considering what was set out in his written motion, to the extent that it's legible, I believe that issues of ineffective counsel can be raised on appeal and it's not necessary at this point for me to appoint new counsel for the defendant." He added that he also believed it was "not necessary that I prevent his present counsel from arguing the motion to reconsider the sentence." Thereafter, the defendant's motion to reconsider sentence was argued. At the conclusion of the State's argument, the following colloquy occurred:

"THE COURT: Was mental health an element in any of these—

THE DEFENDANT: No. Can I ask you something, Judge?

THE COURT: No, sir, no. Not at the moment.

THE DEFENDANT: Please, Mr.—

THE COURT: Not at the moment.

THE DEFENDANT: All right. Thank you.

THE COURT: Was there—Was mental health made an—even an affirmative defense or was it part of this case?

[COUNSEL FOR THE STATE]: No, Your Honor, other than the—as the Court inquired, for the fitness issues originally, no, there was no issues of—

THE COURT: Okay.

18

[COUNSEL FOR THE STATE]: —guilty but mentally ill or anything like that.

THE COURT: All right."

¶ 31 The judge then asked the defendant's counsel if counsel had anything to add. Counsel noted that he believed the defendant wished to speak. The judge agreed but gave counsel a second opportunity to add to the conversation. Counsel stated, "I have nothing else, Your Honor." The judge then spoke again with the defendant, who took issue with the State's arguments on the motion to reconsider, and with his trial in general. At the conclusion of the hearing, the judge took the motion to reconsider under advisement and subsequently denied it. This timely appeal followed.

¶ 32                                    II. ANALYSIS

¶ 33 On appeal, the defendant first contends that "[t]he trial court and counsel improperly continued with trial after a *bona fide* doubt as to fitness should have been raised [because the defendant] did not take his medication the [second] day of trial and [thereafter began] acting erratically." In the alternative, the defendant contends that "the trial court failed to conduct an adequate *Krankel* inquiry into [the defendant's] *pro se* allegations that trial counsel provided ineffective assistance." With regard to his first argument, he concedes that this claim of error was not preserved but asks this court to review it under the plain-error doctrine. The crux of his argument with regard to his first contention is that either the trial judge or the defendant's trial attorneys should have realized that a *bona fide* doubt existed as to the defendant's fitness, based upon the undisputed fact that the defendant was not administered his medication on the second day of his trial and began to act erratically shortly thereafter.

¶ 34 The State responds that the defendant's behavior at trial was intentional and self-serving, and was consistent with the opinion of Dr. Vallabhaneni that there existed "no strong evidence that [the defendant was] clearly suffering from active psychotic symptoms like hallucinations and

19

paranoid delusions," and that instead the defendant possibly was "malingering" or faking illness. The State also notes Dr. Vallabhaneni's diagnosis of the defendant as suffering from antisocial personality disorder and the fact that Dr. Vallabhaneni eventually found the defendant fit to stand trial. Overall, the State characterizes the defendant as a conniving and manipulative person whose outbursts were convenient attempts to interject his theories into the case in an effort to convince the jury that the defendant did not commit the murder, rather than the outbursts of someone who suffered from a mental illness to the extent that the defendant was not fit to stand trial. Thus, the State contends, no *bona fide* doubt as to the defendant's fitness existed, despite the fact that the defendant was not administered his medication on the second day of trial.[3]

¶ 35    The crux of the defendant's *Krankel* argument is that although the judge holding the hearing did briefly address some issues, the most important issue—the defendant's mental health—was not "fully developed" at the hearing, in part because "[n]o questions were asked of counsel." The defendant contends that the judge failed to conduct an adequate inquiry because the judge "did not ask any further details about a possible insanity defense even though [he] learned of [the defendant's] finding of unfitness, and knew of a psychiatrist [the defendant] wanted to call as a witness." The State responds that the inquiry was adequate, because the calling of witnesses is typically a matter of trial strategy that is immune to claims of ineffective assistance of counsel, and because, at the inquiry, the defendant did not "assert[ ] that his trial counsel had mishandled his case due to any mental illness he might have, but rather an issue about calling a witness." The State adds that, subsequently, "when the defendant was asked if he had any other reasons that his trial counsel was ineffective, he did not bring anything about potential mental illness up." The

_____

[3]As noted above, Judge Kelley did not make a record as to whether the defendant was administered his medications on the morning of the third day of trial, when the defendant also engaged in interruptions and disruptions.

20

State notes as well that the defendant does not cite any authority for the proposition that a judge always is required, during a *Krankel* inquiry, to question the defendant's trial counsel.

¶ 36     For reasons we explain below, we turn first to the defendant's *Krankel* argument. Under *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny, when a criminal defendant, subsequent to the defendant's trial, raises a *pro se* claim of ineffective assistance of counsel, "the trial court must conduct an inquiry into the factual basis of the defendant's claim to determine whether new counsel should be appointed to assist the defendant." *People v. Bell*, 2018 IL App (4th) 151016, ¶ 35. The inquiry may involve (1) asking defense counsel to answer questions and explain facts and circumstances relating to the claim, (2) discussing the claim with the defendant, or (3) evaluating the claim on the basis of the trial judge's knowledge of defense counsel's performance at trial and, if applicable, the insufficiency of the *pro se* allegations on their face. *Id*. If, as a result of the inquiry, the trial judge determines there has been a possible neglect of the case by defense counsel, the trial judge "should appoint new counsel to independently investigate and represent the defendant at a separate hearing." *Id*. However, if the trial judge determines that the *pro se* allegations are without merit, or pertain only to matters of trial strategy, the trial judge may deny the *pro se* claim without appointing new counsel to represent the defendant. *Id*.

¶ 37     With regard to triggering this process, the Illinois Supreme Court has examined the question of how much detail a *pro se* defendant must provide to warrant a *Krankel* inquiry. *People v. Ayres*, 2017 IL 120071, ¶¶ 9-18. The *Ayres* court concluded that "when a defendant brings a clear claim asserting ineffective assistance of counsel, either orally or in writing, this is sufficient to trigger the trial court's duty to conduct a *Krankel* inquiry." *Id.* ¶ 18. The *Ayres* court noted that, for a reviewing court, the operative concern is whether the trial judge conducted an inquiry that was adequate. *Id.* ¶ 13. The goal of the inquiry "is to facilitate the trial court's full consideration of a defendant's *pro se* claim and thereby potentially limit issues on appeal." *Id*. A proper inquiry

21

will create the record necessary to adjudicate any claims raised on appeal. *Id*. Likewise, the failure to conduct a proper inquiry precludes appellate review. *Id*. The court reiterated that the purpose of the inquiry by the trial judge "is to ascertain the underlying factual basis for the ineffective assistance claim and to afford a defendant an opportunity to explain and support [the defendant's] claim." *Id*. ¶ 24. We review *de novo* the legal question of whether the trial court conducted an adequate *Krankel* inquiry. See, *e.g.*, *People v. Jolly*, 2014 IL 117142, ¶ 28.

¶ 38 Although it is true, as the State contends, that there is no hard and fast requirement, in every *Krankel* inquiry, that the judge conducting the inquiry must question the defendant's trial counsel, it does not appear in this case that the judge even realized that he had the option of doing so. As described above, at the outset of the hearing, the judge told the defendant, *inter alia*, that "[t]he attorneys that have been appointed to represent you in this case are also *not to be allowed* to come in and try to explain away why they might disagree with your assessment." (Emphasis added.) This statement is troubling, because, as explained above, it is quite normal during a *Krankel* inquiry for a judge to, *inter alia*, ask defense counsel to answer questions and explain facts and circumstances relating to the defendant's *pro se* claim or claims. See, *e.g.*, *Bell*, 2018 IL App (4th) 151016, ¶ 35. Either because he did not realize this, or for other reasons that are not apparent from the record, the judge foreclosed himself from utilizing this common and potentially helpful line of inquiry. Also problematic is the fact that because the judge who presided over the inquiry did not preside over the case at all prior to the inquiry, he was also foreclosed from using another standard tool employed in *Krankel* inquiries: evaluating the defendant's *pro se* claim or claims on the basis of the judge's knowledge of defense counsel's performance at trial and, if applicable, the insufficiency of the *pro se* allegations on their face. See, *e.g.*, *id*.

¶ 39 The only remaining commonly used tool was the sole one the judge employed: talking directly to the defendant about the defendant's *pro se* claims. See, *e.g.*, *id*. Considering the fact

22

that the claims in the defendant's handwritten document included that the defendant was "incompetent" and that his "mental played role," this was a questionable approach for the judge to take, particularly if he understood that the law allowed him to speak to the defendant's trial attorneys about the defendant's *pro se* claims, but he nevertheless chose to speak only to the defendant. This is also a surprising approach in light of the fact that when the judge referenced the defendant's written document, he specifically commented that it was difficult to understand, stating that he had evaluated it "to the extent that it's legible."

¶ 40　Moreover, as the above-quoted colloquy demonstrates, the judge's attempt to engage the defendant in a conversation about his claims was not very fruitful either, although the defendant did manage to state that he was not allowed, at any point, to present an insanity defense or a guilty but mentally ill defense. The judge, however, did not follow up on this contention during the *Krankel* inquiry; instead, during the subsequent hearing on the motion to reconsider sentence, the judge asked the State, rather than the defendant's trial attorneys, if "mental health" was "made an —even an affirmative defense or was it part of this case?" Counsel for the State responded, "No, Your Honor, other than the—as the Court inquired, for the fitness issues originally, no, there was no issues of *** guilty but mentally ill or anything like that."

¶ 41　It is not clear from the record why the State would make this statement, in light of the fact that on October 25, 2016, the judge who preceded Judge Kelley entered an order appointing Dr. Cuneo, on the motion of the defendant, to evaluate the defendant's "sanity at the time of the offense, and whether he would qualify for a guilty-but-mentally-ill plea." It is also not clear why, when subsequently given the opportunity to speak—an opportunity they were not given during the *Krankel* inquiry—the defendant's trial attorneys also failed to reference the October 25, 2016, order. This is especially concerning because, as explained above, that order specified that because

23

Dr. Cuneo was being appointed as an expert witness for the defense, Dr. Cuneo's report would be provided to the defendant's trial attorneys only.

¶ 42     Because of the manner in which the *Krankel* inquiry unfolded, it remains unclear from the record if Dr. Cuneo ever produced any such report, and if so, whether the defendant's trial attorneys ever received the report, ever read the report, and ever considered formulating defenses on the basis of the report. Thus, the judge conducting the *Krankel* inquiry did not have enough information to accurately assess the factual basis for the defendant's *pro se* claim that the defendant was "incompetent," that his "mental played role," and that his trial attorneys were ineffective because the defendant was not allowed to present defenses of insanity or guilty but mentally ill. See *Bell*, 2018 IL App (4th) 151016, ¶ 35 (when a criminal defendant, subsequent to the defendant's trial, raises a *pro se* claim of ineffective assistance of counsel, "the trial court must conduct an inquiry into the factual basis of the defendant's claim to determine whether new counsel should be appointed to assist the defendant").[4]

¶ 43     Accordingly, although we take no position at this point with regard to the merits of the defendant's ineffective assistance of counsel claims, our *de novo* review of the legal question of whether the trial court conducted an adequate *Krankel* inquiry (see, *e.g.*, *Jolly*, 2014 IL 117142, ¶ 28) leads us to conclude that further proceedings by the circuit court are required in this case. Because this case must be remanded to allow the circuit court to conduct proper *Krankel* proceedings, we decline to address the defendant's other allegation of error at this time. See *Ayres*,

---

[4]Although, as explained above, at the defendant's sentencing hearing, one of the defendant's trial attorneys stated, with regard to the defendant's mental health, that "[w]e acknowledge that it doesn't rise to the level of a defense *** , but it's still a factor in mitigation," that in no way clarifies the question of whether Dr. Cuneo ever generated such a report, and whether the defendant's attorneys ever received, read, and considered such a report when formulating potential defenses in this case, because although counsel referenced "Dr. Cuneo's fitness evaluation," when making this statement, he did not reference any other type of report from Dr. Cuneo or any other expert, such as a report discussing potential insanity or guilty but mentally ill defenses.

2017 IL 120071, ¶ 13 ("the goal of any *Krankel* proceeding is to facilitate the trial court's full consideration of a defendant's *pro se* claim and thereby potentially limit issues on appeal"; whereas a proper inquiry will create the record necessary to adjudicate any claims raised on appeal, the failure to conduct a proper inquiry precludes appellate review). Depending upon the results of the circuit court's proceedings on remand in this case, the defendant's other claim of error may become moot. If it does not, it is our expectation that adequate *Krankel* proceedings will produce a more complete record of matters that may be related to that claim, so that we can adequately address the claim. Accordingly, we direct appellate counsel to provide copies of their briefs to the trial attorneys and to the circuit court on remand. See *Bell*, 2018 IL App (4th) 151016, ¶ 37.

¶ 44                                    III. CONCLUSION

¶ 45    For the foregoing reasons, we remand with directions for the circuit court to conduct proper *Krankel* proceedings with regard to the defendant's assertions of ineffective assistance of trial counsel.


¶ 46    Remanded with directions.