NOTICE

Decision filed 03/29/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 210148-U

NO. 5-21-0148

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 15-CF-1085 |
| | ) | |
| LAMARC R. GARRETT, | ) | Honorable |
| | ) | Christopher E. Hitzemann, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Boie and Justice McHaney concurred in the judgment.

**ORDER**

¶ 1　*Held*: Because this court does not have adequate information to assess three of the defendant's four contentions on appeal, we vacate the circuit court's order following its most recent *Krankel* proceedings, and we remand this cause with directions that the circuit court conduct a retrospective fitness hearing.

¶ 2　The defendant, Lamarc R. Garrett, appeals his conviction and sentence after a jury trial in the circuit court of St. Clair County in which he was found guilty of one count of first degree murder and subsequently was sentenced to serve 65 years in the Illinois Department of Corrections, followed by 3 years of mandatory supervised release. For the following reasons, we vacate the circuit court's order following its most recent *Krankel* proceedings, and we remand this cause with directions that the circuit court conduct a retrospective fitness hearing.

1

¶ 3                                    I. BACKGROUND

¶ 4       This case returns to this court following our remand to the circuit court of St. Clair County

for the circuit court to conduct a proper preliminary *Krankel* inquiry.[1] See *People v. Garrett*, 2021

IL App (5th) 180277-U. We begin with the exposition of the facts necessary to an understanding

of the reasons for our remand, and necessary to our disposition of the issues raised by the defendant

in this appeal, then add the necessary facts from the most recent *Krankel* proceedings on remand.

¶ 5       On October 2, 2015, the defendant was indicted on one count of first degree murder. The

indictment charged that on or about September 5, 2015, the defendant shot Oscar Carbajal in the

chest, causing the death of Carbajal. On November 9, 2015, the judge who was then presiding over

the case entered an order in which the judge stated that the defendant's trial counsel had raised "a

*bona fide* doubt as to [the defendant's] ability to understand the nature of the charge against him,

to plead guilty or to stand trial, and cooperate in his own defense." The order appointed Dr. Daniel

Cuneo to evaluate the fitness of the defendant to stand trial.

¶ 6       On February 4, 2016, a status hearing was held. At one point during the hearing, the judge

addressed the defendant directly, asking, "do you think you know what's going on here?" The

transcript of the hearing states that the defendant "indicated no." The judge then asked, "Dr.

Cuneo—Do you remember talking to Dr. Cuneo?" The transcript again states that the defendant

"indicated no." Following the hearing, the judge entered an order in which he noted that the parties

stipulated to the expertise of Dr. Cuneo, and in which he noted that the parties were in receipt of a

report from Dr. Cuneo, dated January 18, 2016, in which Dr. Cuneo found that the defendant was

---

[1]A preliminary *Krankel* inquiry is required when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel. See, *e.g.*, *People v. Jackson*, 2020 IL 124112, ¶ 96. If the circuit court concludes, following the preliminary inquiry, that the defendant's *pro se* "allegations show possible neglect of the case, new counsel should be appointed" to represent the defendant at further proceedings on the claims, which may include a full evidentiary hearing. *Id.* ¶ 97.

"presently unfit to stand trial," but that if the defendant was "provided with a course of inpatient treatment," there existed "a substantial probability" that the defendant would "be able to attain fitness within one year."

¶ 7    Dr. Cuneo's January 18, 2016, report, which is included in the record on appeal, noted that Dr. Cuneo conducted two interviews of the defendant, consulted clinical records from the St. Clair County jail, spoke with nursing staff at the jail and with other jail staff, and spoke with the defendant's mother "to gather additional information about her son." When Dr. Cuneo asked the defendant a question during his first attempt to interview the defendant, the defendant "simply stared blankly ahead." Dr. Cuneo noted that the defendant "never spoke during my first attempt to assess him and would only shake his head or shrug," which was consistent with behavior the defendant had exhibited at the jail, as observed by jail staff. While incarcerated at the jail, the defendant had "been in and out of the Quiet Room at the jail and ha[d] gone from mutism to mania." The defendant "refused to give [Dr. Cuneo] any information," including about relatives. Dr. Cuneo eventually obtained information about the defendant's mother, who subsequently "stated that her son had been diagnosed with paranoid schizophrenia and that he was 'getting a shot' to control his psychosis." The defendant's mother informed Dr. Cuneo that the defendant "had been seeing a psychiatrist in St. Louis," and that the defendant had "been placed on the psychiatric wing when he had been at the Jefferson City Correctional Facility." She also informed Dr. Cuneo that the defendant had "times when she visits him that he will simply stand mute and refuse to respond. Other times he will respond to her and complain of voices and people out to get him."

¶ 8    The second time Dr. Cuneo attempted to interview the defendant, which was on January 18, 2016, the defendant initially "would only respond by shrugs." After Dr. Cuneo told the defendant that he had spoken to the defendant's mother, and that she had said that the defendant

3

should talk to Dr. Cuneo, the defendant eventually began to respond. Dr. Cuneo's report noted that the defendant's mental status exam "revealed [the defendant] to be oriented only to person and not to place or time," which meant that the defendant "knew who he was, but he was unable to tell [Dr. Cuneo] where he was or the correct month or year." When asked where he was, the defendant "shrugged that he did not know," then, "when pushed," the defendant "mumbled that he was in St. Louis, but he was unsure what state he was in." Dr. Cuneo noted that the defendant "could tell me that the day of the week was Monday, but he shrugged that the month was February and that the year was 1987." Dr. Cuneo asked the defendant if he ever experienced any type of hallucinations, to which the defendant "shrugged his head 'yes,' " then, again "when pushed," the defendant "mumbled that he hears 'bad stuff, good stuff, I don't know.' " The defendant "later mumbled that these voices tell him to kill others and to kill himself," and the defendant told Dr. Cuneo that the defendant "had attempted to kill himself once by hanging himself when he was in prison." Dr. Cuneo characterized the defendant's thinking as "delusional," with the delusions being "paranoid in nature." Dr. Cuneo reported that the defendant "mumbled how people 'were out to get him every day.' " The defendant's "thinking was extremely impoverished and there appeared to be thought blockage," as well as "long pauses both in and between his responses."

¶ 9     Dr. Cuneo reported that although "no formal intellectual testing was done," the defendant "appeared to be functioning no higher than the Dull Normal Range of Intelligence." When asked how far he had gone in school, the defendant "shrugged that he did not know. When pushed, he mumbled sixth grade and could not tell *** the name of the school." The defendant's mother reported that the defendant "had gone to University High School and had dropped out in either the tenth or eleventh grade," although she did not know why he had dropped out. Dr. Cuneo reported that the defendant's "memory, both short and long term, was impaired," and that the defendant "could only repeat back accurately three numbers forward and three numbers backwards," and

4

"could not give any type of history." Dr. Cuneo reported that the defendant's "affect was flat and he often would simply respond by shaking his head or shrugging his shoulders." Although the defendant denied any type of alcohol use, when asked about his use of drugs, the defendant "mumbled, 'Head drugs.' When pushed on what he meant, he mumbled, 'Got them at head store.' " Dr. Cuneo noted that the defendant's records indicated that during his jail admission interview, the defendant "stated that he used crack cocaine, PCPs, and marijuana on a regular basis." Dr. Cuneo reported that when he asked the defendant about the defendant's past mental health treatment, the defendant "would only mumble, 'Shot,' " and then "shrugged that he could not remember who had treated him or the name of the medication."

¶ 10     Dr. Cuneo noted that while incarcerated at the jail, the defendant was receiving Haldol, Cogentin, and Zoloft, and Dr. Cuneo stated that his diagnosis for the defendant was "Schizophrenia, Cannabis Use Disorder in a Controlled Environment, Cocaine Use Disorder in a Controlled Environment, Phencyclidine Use Disorder in a Controlled Environment, [and] Borderline Intellectual Functioning." Dr. Cuneo opined that the defendant's mental illness substantially impaired the defendant's "ability to understand the nature and purpose of the proceedings against him and his ability to assist in his own defense," that the defendant was "disoriented as to place and time," and "was unable to tell [Dr. Cuneo] where he was and did not know the year or month." The defendant could not describe "what he was charged with and thought he was in a jail in St. Louis." The defendant could not describe why he was jailed, "could not grasp the roles of a public defender or state's attorney due to his very impoverished thinking," and "could not cooperate with his attorney in any meaningful manner, much less assist in his own defense due to his exreme [*sic*] cognitive confusion." Dr. Cuneo noted that the defendant's "attention span is so limited that he could not follow the court proceedings," and that, accordingly, in Dr. Cuneo's opinion, the defendant was "presently unfit to stand trial." Dr. Cuneo noted that he believed that if

5

the defendant "were provided with a course of inpatient psychiatric treatment and stabilized on psychotropic medication," there then existed "a substantial probability that [the defendant] would be able to attain fitness within the course of one year."

¶ 11    On June 2, 2016, the judge entered an order in which he noted that the parties stipulated to the expertise of Dr. Rajendra Gupta of the Alton Mental Health Center, and in which he noted that the parties were in receipt of a report from Dr. Gupta, dated May 18, 2016, in which Dr. Gupta found the defendant was still unfit for trial, but that there existed a substantial probability that the defendant would "attain fitness for trial within the one-year statutory limit." The report, which is also included in the record on appeal, listed one of the defendant's "[d]eficits" as "a history of non-compliance with medication." The report noted, *inter alia*, that the defendant was "currently verbalizing the following symptoms: hallucinations, impaired memory, history of self injurious behaviors, history of sexual abuse, and paranoia."

¶ 12    On September 13, 2016, the judge entered an order in which he noted that the parties stipulated to the expertise of Dr. Nageswararao Vallabhaneni, a psychiatrist at the Chester Mental Health Center, and in which he noted that the parties were in receipt of a report from Dr. Vallabhaneni, dated July 29, 2016. The report, which likewise is included in the record on appeal, reiterated that the defendant was still unfit for trial, and that the defendant continued to be treated with "psychotropic medication" in an effort "to control the psychotic symptoms including paranoid delusions." Dr. Vallabhaneni noted, however, that he believed the defendant had "not cooperated well" in terms of making progress toward attaining fitness. Dr. Vallabhaneni opined that there existed "no strong evidence that he is clearly suffering from active psychotic symptoms like hallucinations and paranoid delusions," and held out the possibility that the defendant was "malingering" or faking illness. He noted that the defendant "did not participate in treatment plan reviews well," was "not willing to take the fitness test," and posited that there "seems to be a strong

6

element of either deception or refusal to cooperate or give the right answers to the questions on the test." As a secondary diagnosis, he listed "Anti-Social Personality Disorder."

¶ 13   On October 24, 2016, the judge entered an order in which he noted that the parties had "received a report from [the Chester Mental Health Center] indicating that the defendant ha[d] attained fitness." This report, which is also included in the record on appeal and also authored by Dr. Vallabhaneni, contained much information that appears to have been copied and pasted from Dr. Vallabhaneni's July 29, 2016, report, but also stated that there had been "significant changes" since that report. The new report indicated that the defendant "took a full fitness test on his own with his therapist present during that time," with the test dated September 22, 2016. The report indicated that the defendant "took the test willfully and he performed extremely well without any assistance." The defendant scored 100% on the test, which Dr. Vallabhaneni opined "not only indicates his cooperation, also his level of performance, understanding of his current charges and his understanding of various court proceedings." Dr. Vallabhaneni added that the defendant presently had "no clinical indication or reason for remaining unfit to stand trial." He added, however, that the defendant still had problems with cooperating with Dr. Vallabhaneni and staff on working toward his fitness goals, which Dr. Vallabhaneni attributed to a desire on the part of the defendant "to not return to the court." He noted that since the July 29, 2016, report, the defendant had "maintained his behavior without having any difficulties," and "was not seen as being clearly psychotic, meaning delusional or depressed." He further noted that the defendant "was medication compliant and in fact wanted to remain on medication," because the defendant "thought that without medication he would lose control and act out." Dr. Vallabhaneni stated that "[f]or that reason, this writer did not intend to change any of his medications; the focus was more on his legal matters and fitness issues." In several places in the report, he referred to the defendant's cooperation with his treatment team as being "selective," and noted that most of the defendant's

7

communication was still nonverbal, consisting of shrugs, body gestures or language, and short "yes" or "no" answers rather than longer verbal explanations. Dr. Vallabhaneni stated that until further evidence was available, the defendant's diagnosis was still "Schizophrenia Paranoid," with a secondary diagnosis of "Anti-Social Personality Disorder," but reiterated that even while on medication, the defendant was fit to stand trial and assist with his own defense. He specifically wrote: "Overall, it is this writer's impression that [the defendant] is not suffering from any acute psychotic symptoms; however, the diagnosis has not been changed which itself, including the psychotropic medication that he has been receiving, had no direct impact on his ability to understand his legal matters including the charges and ability to participate in legal proceedings." He concluded his report by noting that the defendant was continuing "the same treatment including his current antipsychotic and other medications as prescribed," and was "fully compliant with treatment and *** not experiencing any adverse effects from this treatment." Documents that accompanied the report included various case notes written by Dr. Vallabhaneni and other members of the defendant's treatment team, and the fitness tests the defendant had taken or refused to take during his treatment.

¶ 14    On the following day, October 25, 2016, the judge entered an order appointing Dr. Cuneo, on the motion of the defendant, to evaluate the defendant's "sanity at the time of the offense, and whether he would qualify for a guilty but mentally ill plea." The order specified that because Dr. Cuneo was being appointed as an expert witness for the defense, Dr. Cuneo's report would be provided to the defendant's trial counsel only. A subsequent order reserved ruling on the separate question of the defendant's fitness to stand trial. No report regarding the defendant's "sanity at the time of the offense, and whether he would qualify for a guilty but mentally ill plea"—whether from Dr. Cuneo or any other expert—was contained in the record on appeal presented to this court at the time of the defendant's first appeal.

8

¶ 15    On December 29, 2016, a status hearing was held before the Honorable Randall W. Kelley, who was assigned to the case after the judge who was previously assigned to it ended his service on the bench. Judge Kelley presided over the case for all of the subsequent trial court proceedings to and including the defendant's sentencing hearing. At the December 29, 2016, hearing, the defendant's trial counsel stipulated that the defendant was fit to stand trial. Following the hearing, Judge Kelley entered an order finding the defendant fit to stand trial and setting a date for a jury trial. Shortly before the jury trial, the defendant requested permission to "fire" his public defenders, claiming that they had "no defense" for him. Judge Kelley noted that both of the defendant's attorneys were highly competent and denied the defendant's request. Following the defendant's jury trial—the contents of which are not relevant to this appeal—the defendant was found guilty on August 2, 2017, of first degree murder, and was found to have personally discharged the firearm that caused the death of Oscar Carbajal. His attorneys filed a posttrial motion.

¶ 16    On September 12, 2017, a hearing was held on the posttrial motion filed by the defendant's attorneys. At the hearing, they argued that during jury deliberations, evidence was inadvertently provided to the jury about a firearm and ammunition that were found on the person of the defendant at the time of his arrest, but that were not consistent with the firearm used in the murder, which potentially prejudiced the jury against the defendant, and which the parties had agreed, prior to trial, to keep from the jury. The State did not object to the defendant's factual characterization or argument, and in fact stated that it had "no objection to the [c]ourt granting the post-trial motion." Judge Kelley thereafter entered an order in which he set aside the jury verdict and granted the defendant a new trial.

¶ 17    The defendant's second trial—the result of which ultimately led to this appeal—began on February 5, 2018. Witness testimony began on February 6, 2018. Because it is not relevant to the issues raised by the defendant in this appeal, we need not consider the substance of the witness

9

testimony in detail, other than to state that, from a strictly factual point of view and aside from factual and legal questions of the defendant's mental state at the time of the murder and at the time of trial, the evidence—including video footage and photographs—overwhelmingly showed that the defendant committed the acts that caused the death of Carbajal.

¶ 18    Of significance to this appeal, during the course of the State's presentation of its case in chief late on the morning of February 6, 2018, the defendant began a series of interruptions and disruptions that are related to the issues raised in this appeal. The defendant attempted to pose objections and made derogatory comments about the proceedings, the parties, the judge, and witnesses. Judge Kelley attempted to calm the defendant, at one point stating, "you do want to stay for the rest of your trial, don't you?" He assured the defendant that the defendant would have the opportunity to present his case, which appeared to temporarily appease the defendant. However, shortly thereafter, the defendant began to interrupt again. Judge Kelley again attempted to intervene and told the defendant that the defendant had the right to be present "for every minute of this trial," unless the defendant chose not to be present. The defendant then repeatedly stated that he did not wish to be present, and he was taken from the courtroom. At the request of the defendant's trial attorneys, the court went into recess, and the jurors were allowed to break for lunch.

¶ 19    Following the break, and outside the presence of the jury, the parties and Judge Kelley agreed to recess the proceedings until the following morning. Judge Kelley then addressed the defendant at length, noting that the defendant had not previously had behavioral issues in Judge Kelley's courtroom, and asking the defendant, "Do you feel like you have any needs or desires to talk to Dr. Cuneo before we start up again?" The defendant responded, "I have a need and a desire to hire myself as my own attorney." Judge Kelley assured the defendant that they would discuss that the following morning. The defendant was thereafter taken from the courtroom, and a

discussion continued between Judge Kelley, the State, and the defendant's attorneys. One of the defendant's attorneys stated, with regard to the displeasure the defendant had voiced with regard to their representation of him, that "my one hesitation would be he's basically shut down in wanting to talk to us mid-trial." Judge Kelley replied, "We'll see where we are in the morning." Judge Kelley thereafter added, "For the record, the Court has been advised that [the defendant] generally takes certain medications every morning and was not administered those medications this morning. And so, we're going to wait and see what tomorrow brings." One of the defendant's attorneys replied that he wished to make a record "that until today, there—even leading up to today, there had been no instances that would have led us to believe that we would be in this situation." Judge Kelley agreed, then added, "I don't want to just pull the plug on everything at this point." The jurors were thereafter summoned and excused for the day.

¶ 20    The following morning, February 7, 2018, proceedings began, outside the presence of the jury, with the defendant's attorneys reporting that they had "attempted to speak with" the defendant, but that the defendant was "refusing to speak with us." Judge Kelley then attempted to engage the defendant in conversation, but the defendant mostly responded nonverbally, with what the transcript characterizes as shaking or nodding his head "yes" or "no." Judge Kelley admonished the defendant that "if you become disruptive or threatening to anybody in any fashion, I certainly have the authority and I will remove you from this proceeding and continue your trial without your presence." Thereafter, counsel for the State stated that, "just, I guess to clarify *** [i]t's my understanding that the defense has no issues as to fitness of the defendant." Judge Kelley responded, "The Court has a prior report from Dr. Cuneo that indicates that [the defendant] is fit to stand trial. So, we're proceeding on that."[2] Judge Kelley ordered that all physical restraints be

---

[2]The record on appeal contains no report from Dr. Cuneo that states that the defendant was fit to stand trial. The record contains only the aforementioned report to that effect from Dr. Vallabhaneni.

removed from the defendant prior to the jury entering the courtroom, stating that "there's nothing to suggest that he made or threatened any physical harm to himself or anyone else," and finding that "restraints at this time are not necessary." Judge Kelley did not make a record of whether the defendant had been administered his medications that morning.

¶ 21    The jury returned to the courtroom and the testimony of witnesses resumed. Shortly thereafter, so did the interruptions and disruptions of the defendant. After the second interruption, Judge Kelley admonished the defendant to "[b]e quiet." After several more sporadic and short comments from the defendant on the proceedings, the defendant began to engage in longer and more frequent commentary, which Judge Kelley for the most part ignored. Finally, following an interruption, Judge Kelley stated to the defendant, "you've been admonished previously not to be disruptive. I've allowed you to carry on for a while." The defendant replied, "Oh." The disruptive commentary from the defendant temporarily ceased, then began again. Throughout the course of the day's testimony, the defendant commented dozens of times, most of which Judge Kelley continued to ignore. At one point, Judge Kelley stated to the defendant, "I don't want to have to stop you from participating." The defendant's disruptive commentary continued. Judge Kelley thereafter stated to the defendant, "there's a Supreme Court case *** that sets forth the parameters that I need to follow as far as my discretion in allowing a defendant or a witness to continue to act out and be disruptive." He added, "I've greatly exceeded the parameters that I would be limited to. So, just as a fair warning, you either got to tone it down much more—much less frequently, I should say, or I'll have to take other measures." The defendant's disruptive commentary, utterings that are characterized in the transcript as "inaudible," and laughter continued. After the defendant accused one of the witnesses of "probably" having committed the murder, Judge Kelley stated to the defendant, "you're perilously close." The disruptions continued.

¶ 22    After the State rested its case, Judge Kelley asked the defendant, outside the presence of the jury, if the defendant wished to testify. When the defendant failed to respond, Judge Kelley asked again. When the defendant failed a second time to respond, Judge Kelley told the defendant that if the defendant did not respond, "I have to presume that's an indication that you do not want to testify in your own behalf." The defendant continued to fail to respond, despite Judge Kelley's additional repeated attempts to question the defendant. Thereafter, one of the defendant's attorneys agreed that the defense was resting. As the State presented its closing argument, the defendant began yet another series of interruptions and disruptions. Judge Kelley intervened, again admonishing the defendant that Judge Kelley could have the defendant removed from the courtroom. The defendant argued that he was now acting as his own attorney. Judge Kelley eventually ordered the defendant removed from the courtroom, and the trial continued without him.

¶ 23    Following closing arguments, as Judge Kelley began to instruct the jury, Judge Kelley stated that, "I must remind you that the defendant remains innocent until proven guilty at this time and throughout your deliberations. Whether or not the defendant is present in this courtroom should have no consideration by you in your findings that you will make." Judge Kelley added, "Additionally, I must admonish you that you shall not consider any interruptions or disruptions that may have been indicated by or caused by the defendant during the course of this trial proceeding." He told the jury, "None of that is relevant. None of that is evidence or testimony in this proceeding in any fashion." He reminded the jury that the defendant "remains, even though he's not present here in the courtroom, he remains innocent until you through deliberations would decide that the State has proved the defendant's guilt beyond a reasonable doubt." He added, "So, I don't want you to take anything from any of the—of the discourse between the defendant and myself or anyone else during the course of this trial as anything more than just that." He reiterated

that "[i]t's not evidence, it's not testimony, and it should not be considered either in favor of the defendant or certainly against the defendant." After deliberating for fewer than 30 minutes, the jury found the defendant guilty of first degree murder and found that the defendant personally discharged the firearm that caused the death of the victim.

¶ 24    On February 20, 2018, the defendant filed a posttrial motion, which was denied, following argument, at the outset of the defendant's sentencing hearing on February 26, 2018. At the sentencing hearing, the defendant's mother testified that when the defendant takes his medication, he is "humble" and "real calm," but that when he does not take his medication, he begins "moving too much." She stated that the defendant had struggled with mental health issues for "[a]lmost eight or nine years," but added that the defendant had "been like this all his life, but he just been on the medicine that long." She testified that she could tell when the defendant was not on medication, because he would not "be still when he not on it." She testified that on the date of the murder, the defendant was not on medication. She added, "I told him he needed to get some rest, and he needed to go lay down. He wouldn't. And he was talking real reckless, so I know he wasn't on his medicine at the time." On cross-examination, she agreed with counsel for the State that, even with the "issues" she had discussed about her son's mental health, she believed her son knew "right from wrong."

¶ 25    The defendant's father testified that when the defendant "was on his medication, he was a total different person than without taking it." He testified that the defendant "explained" to him that "the night that this thing had transpired, he hearing voices in his head. He don't know what's going on." The defendant's father added, "He was diagnosed paranoid schizophrenic. If he ain't on his medication, how he going to know what's going on?" At the conclusion of the defendant's father's testimony, the defendant's father requested permission to address Judge Kelley directly,

14

which Judge Kelley allowed. The defendant's father stated, "I want to ask for the mercy of the court for my son because he—he not—he not—he not here mentally."

¶ 26    In argument, the State contended, *inter alia*, that the murder occurred because the "defendant was angry and this was not a psychiatric reason." The State pointed to evidence from trial that it suggested supported its position, stating, "This is not someone that has a psychiatric problem that is overreactive. This is someone that shot someone that he was mad at, killed him, and then tries to get rid of the vehicle and get rid of the evidence that would put him in the car." The State added, "There was nothing wrong with him. There was not any problem with his state of mind at the time." The State requested a sentence of 65 years' imprisonment.

¶ 27    The defendant's trial counsel argued, in mitigation, that the defendant "was suffering from a serious mental illness at this time. He's a diagnosed paranoid schizophrenic, and that is just the tip of the iceberg when it comes to his diagnosis." Counsel noted that the court had "Dr. Cuneo's fitness evaluation," and that the defendant "was unfit when he first got into the system," then "spent a chunk of time at the Chester Mental Health Center," which counsel suggested "speaks to his state of mind as it was close to the time of this event." Counsel added, "We acknowledge that it doesn't rise to the level of a defense *** , but it's still a factor in mitigation."

¶ 28    Before delivering sentence, Judge Kelley stated that he was "considering in mitigation that the defendant suffers from a mental illness although the report from the court psychologist clearly indicated that the defendant was not controlled by that mental illness in such a state that he was unable to participate in his defense nor would it offer him a legal defense to these charges." He added that, based upon his own observation of the evidence at trial, it was his opinion that "mental illness had little, if any, impact on the actions of the defendant." Thereafter, Judge Kelley sentenced the defendant to 65 years (including 25 years for personally discharging the firearm that

caused the death of the victim) in the Illinois Department of Corrections, followed by 3 years of mandatory supervised release.

¶ 29 On March 7, 2018, the defendant's counsel filed a motion to reconsider sentence. On April 4, 2018, the defendant filed, *pro se*, a handwritten document in which, *inter alia*, he claimed he had received ineffective assistance of counsel at trial, and that Judge Kelley was biased against him. The defendant also claimed that the defendant was "incompetent," that his "mental played role," and that he "didn't get to testify." A hearing was held approximately two weeks later, on April 17, 2018. Because Judge Kelley had retired shortly after sentencing the defendant, the hearing was held before the Honorable Stephen P. McGlynn, who stated during the hearing that he had reviewed the existent court file in the case. Judge McGlynn began the hearing by noting the defendant's *pro se* filing and stating that it included "an allegation of ineffective assistance of counsel." He stated that accordingly he was going to begin by having "a hearing pursuant to *People v. Krankel*." Judge McGlynn then explained the procedure he planned to follow to the defendant, stating that it would be a "a non-adversarial hearing to allow you to explain to me in your own words why you thought your counsel was ineffective." He added that the State would not participate, and that "[t]he attorneys that have been appointed to represent you in this case are also not to be allowed to come in and try to explain away why they might disagree with your assessment." He then stated to the defendant, "So, in your own words, why don't you tell me why you believe your defense attorneys were ineffective."

¶ 30 The defendant responded, "Because they didn't represent me in the right way," thereafter adding, "[d]uring the course of trial, both trials, they really worked more with the State than with me. It was—It was real bad." In response to questions from Judge McGlynn, the defendant stated that he wished to call as a witness a psychiatrist the defendant had seen "on the street" but that he was not allowed to do so. The following colloquy then occurred:

16

"THE COURT: Did you have a defense of insanity?

THE DEFENDANT: Well, when I first—

THE COURT: Or guilty but—or sought a decision of guilty but mentally ill?

THE DEFENDANT: I didn't—I didn't—I didn't get to present anything at the present or then. But once I was—

THE COURT: Was this your second—

THE DEFENDANT: —first incarcerated in St. Clair, they sent me to the Mental Health Center, Psych Ward, Chester.

THE COURT: Was this the second trial of this case?

THE DEFENDANT: The first—

THE COURT: And did the Appellate Court remand it or was there—was there a new trial granted in a post-trial motion?

THE DEFENDANT: Well, I went before the first trial.

THE COURT: Yeah.

THE DEFENDANT: And that was through a different judge, before Kelley.

THE COURT: All right.

THE DEFENDANT: And then when I was at the treatment place, the counselors or caseworkers, or whoever was there, they kind of like tricked me into signing some papers that I really wasn't aware of what was going on at that moment, and they kind of coerced me into signing some papers that—something like they had some answers or something wrote down on it for me or something, and I didn't really get to read them. But I guess that was that I hadn't—

THE COURT: So, there was a—Previous in this case, there was—there was a hearing on your fitness to stand trial, was there not?

17

THE DEFENDANT: Yes.

THE COURT: Okay.

THE DEFENDANT: That's what I'm talking about now. I had—They had found not being able to stand trial at that time, and that's when they sent me to Chester.

THE COURT: All right. And after you received some treatment at Chestnut [*sic*], there was another hearing, and it was determined that you were fit to stand trial, is that correct?

THE DEFENDANT: I don't know about that treatment. But I know about the first one, though."

¶ 31    Thereafter, Judge McGlynn asked the defendant if he had anything else to add about how his attorneys were ineffective. The defendant responded that, during his trials, his attorneys "didn't object to anything that was wrong that the State presented" and "basically helped the State to convict me on charges—over charges." He complained that his attorneys refused to file motions he wished to file, lied to him, did not allow him to testify, and conspired with the State and with Judge Kelley to convict him. He stated that he believed he was "discriminated upon," and added that his conspirators "thought because of my mental health and lack of education that they can just like run over on me, and stuff like that." He concluded that "it's just—it's a real—it was real corrupted, a real corrupted courtroom." Immediately thereafter, Judge McGlynn stated, "I think that listening to the defendant and considering what was set out in his written motion, to the extent that it's legible, I believe that issues of ineffective counsel can be raised on appeal and it's not necessary at this point for me to appoint new counsel for the defendant." He added that he also believed it was "not necessary that I prevent his present counsel from arguing the motion to reconsider the sentence." Thereafter, the defendant's motion to reconsider sentence was argued. At the conclusion of the State's argument, the following colloquy occurred:

18

"THE COURT: Was mental health an element in any of these—

THE DEFENDANT: No. Can I ask you something, Judge?

THE COURT: No, sir, no. Not at the moment.

THE DEFENDANT: Please, Mr.—

THE COURT: Not at the moment.

THE DEFENDANT: All right. Thank you.

THE COURT: Was there—Was mental health made an—even an affirmative defense or was it part of this case?

[COUNSEL FOR THE STATE]: No, Your Honor, other than the—as the Court inquired, for the fitness issues originally, no, there was no issues of—

THE COURT: Okay.

[COUNSEL FOR THE STATE]: —guilty but mentally ill or anything like that.

THE COURT: All right."

¶ 32     Judge McGlynn then asked the defendant's counsel if counsel had anything to add. Counsel noted that he believed the defendant wished to speak. Judge McGlynn agreed, but gave counsel a second opportunity to add to the conversation. Counsel stated, "I have nothing else, Your Honor." Judge McGlynn then spoke again with the defendant, who took issue with the State's arguments on the motion to reconsider, and with his trial in general. At the conclusion of the hearing, Judge McGlynn took the motion to reconsider under advisement and subsequently denied it.

¶ 33     The defendant filed a timely appeal in which he contended that (1) " '[t]he trial court and counsel improperly continued with trial after a *bona fide* doubt as to fitness should have been raised [because the defendant] did not take his medication the [second] day of trial and [thereafter began] acting erratically,' " and (2) in the alternative, " 'the trial court failed to conduct an adequate *Krankel* inquiry into [the defendant's] *pro se* allegations that trial counsel provided

19

ineffective assistance.' " *Garrett*, 2021 IL App (5th) 180277-U, ¶ 33. This court agreed with the latter contention, concluding that a number of issues rendered the first *Krankel* proceedings insufficient. *Id.* ¶¶ 38-43. Because of our conclusion with regard to the defendant's latter contention, we declined to reach his first contention. *Id.* ¶ 43. Instead, we remanded with directions for the circuit court to conduct proper *Krankel* proceedings with regard to the defendant's *pro se* assertions of ineffective assistance of trial counsel. *Id.* ¶¶ 43-45.

¶ 34    Because of what occurred, and did not occur, on remand, we find it necessary to briefly discuss some of the concerns we raised in the analysis section of our previous order about the insufficiency of the first *Krankel* proceedings, and how we hoped they would be remedied by adequate *Krankel* proceedings on remand. After explaining the facts also explained above in this disposition, we first noted that Judge McGlynn did not question the defendant's trial counsel at the first *Krankel* proceedings, even though doing so was permissible and indeed is a quite routine manner of proceeding in a preliminary *Krankel* inquiry. *Id.* ¶ 38.

¶ 35    We also noted that although the defendant told Judge McGlynn that the defendant was not allowed, at any point, to present an insanity defense or a guilty but mentally ill defense, Judge McGlynn did not follow up on this contention during the *Krankel* inquiry. *Id.* ¶ 40. We further noted that, instead, during the subsequent hearing on the motion to reconsider sentence, Judge McGlynn asked the State, rather than the defendant's trial attorneys, if " 'mental health' " was " 'made an—even an affirmative defense or was it part of this case?' " *Id.* We noted that counsel for the State responded, " 'No, Your Honor, other than the—as the Court inquired, for the fitness issues originally, no, there was no issues of *** guilty but mentally ill or anything like that.' " *Id.*

¶ 36    We expressed our puzzlement at this statement from the State, "in light of the fact that on October 25, 2016, the judge who preceded Judge Kelley entered an order appointing Dr. Cuneo, on the motion of the defendant, to evaluate the defendant's 'sanity at the time of the offense, and

whether he would qualify for a guilty-but-mentally-ill plea.' " *Id.* ¶ 41. We also expressed concern about "why, when subsequently given the opportunity to speak—an opportunity they were not given during the *Krankel* inquiry—the defendant's trial attorneys also failed to reference the October 25, 2016, order," and noted that the foregoing was "especially concerning because \*\*\* that order specified that because Dr. Cuneo was being appointed as an expert witness for the defense, Dr. Cuneo's report would be provided to the defendant's trial attorneys only." *Id.* We reasoned that "[b]ecause of the manner in which the *Krankel* inquiry unfolded, it remain[ed] unclear from the record if Dr. Cuneo ever produced any such report, and if so, whether the defendant's trial attorneys ever received the report, ever read the report, and ever considered formulating defenses on the basis of the report." *Id.* ¶ 42. We added the following:

> "Although, as explained above, at the defendant's sentencing hearing, one of the defendant's trial attorneys stated, with regard to the defendant's mental health, that '[w]e acknowledge that it doesn't rise to the level of a defense \*\*\*, but it's still a factor in mitigation,' that in no way clarifies the question of whether Dr. Cuneo ever generated such a report, and whether the defendant's attorneys ever received, read, and considered such a report when formulating potential defenses in this case, because although counsel referenced 'Dr. Cuneo's fitness evaluation,' when making this statement, he did not reference any other type of report from Dr. Cuneo or any other expert, such as a report discussing potential insanity or guilty but mentally ill defenses." *Id.* ¶ 42 n.4.

We thereafter noted that "[d]epending upon the results of the circuit court's proceedings on remand in this case, the defendant's other claim of error may become moot," but that if it did not, it was "our expectation that adequate *Krankel* proceedings [would] produce a more complete record of matters that may be related to that claim, so that we [could] adequately address the claim." *Id.* ¶ 43.

¶ 37    On remand, the judge then handling the case, the Honorable Julie K. Katz, entered an order on January 25, 2021, in which she noted that the defendant had filed, on March 19, 2020, a postconviction petition in which he claimed ineffective assistance of counsel. Judge Katz ruled that in light of our remand, proceedings on the defendant's postconviction petition should be stayed pending the outcome of the proper preliminary *Krankel* inquiry we ordered. On February 12, 2021, the defendant filed a *pro se* motion to dismiss the case against him, wherein he also made certain allegations of, *inter alia*, ineffective assistance of counsel. Thereafter, the case was assigned to the Honorable Christopher E. Hitzemann for purposes of the *Krankel* proceedings.

¶ 38    On April 26, 2021, Judge Hitzemann held a hearing at which he noted that the circuit court had not yet received copies of the briefs filed by the parties on appeal. He stated that he wanted "to make sure that we are completely clear as to all the issues that have been raised in the appellate court so that I can also potentially address them here with you and with the other parties." Accordingly, the matter was reset for May 17, 2021.

¶ 39    On May 17, 2021, the *Krankel* proceedings were held. Judge Hitzemann began the proceedings by asking the defendant to tell Judge Hitzemann what "issues" the defendant had with the representation he received from his attorneys at trial. The defendant indicated that he had "a list of stuff," which he began to recite orally. He recited over 30 allegations. Judge Hitzemann then asked if he could see the written list, which the defendant provided to him. A copy of the defendant's list was admitted into evidence and is contained within the record on appeal. Judge Hitzemann then went through the list, asking the defendant for more details about the allegations. Of relevance to this appeal, although the defendant's list alleged that his attorneys did not present a defense at trial, and did not tell him prior to trial that they had no defense to present, and although the list further alleged that his counsel "didn't say anything about [his] mental status," the defendant's list did not specifically allege that his attorneys failed to properly investigate the

22

defendant's sanity at the time of the offense, and/or whether he would qualify for a guilty but mentally ill plea. The defendant also alleged that his attorneys "failed to let [him] testify."

¶ 40 During a discussion of the defendant's claim that his attorneys should have called a Dr. Muhammad Baber as a witness for the defendant, Judge Hitzemann asked the defendant's trial counsel if they were aware of the defendant's prior relationship with Dr. Baber as a treating physician for mental health issues. One of his counsel testified that they were aware of it, and that they told the defendant that because Dr. Cuneo had been appointed to "review [the defendant] for fitness," Dr. Cuneo would be their only witness as to the defendant's fitness. Counsel testified that they told the defendant that if the defendant wanted another witness to testify about the defendant's fitness, they would have to hire that witness, which they did not believe they had the funds to do.

¶ 41 Noting the concerns this court raised in its previous order, Judge Hitzemann then asked counsel if Dr. Cuneo did in fact evaluate the defendant's sanity at the time of the offense, as well as whether the defendant would qualify for a guilty but mentally ill plea. One of the defendant's counsel testified that Dr. Cuneo did, and that counsel had the report with him at the hearing. He offered to share the report with Judge Hitzemann. Counsel then testified that Dr. Cuneo concluded that the defendant "would not qualify" for a not guilty by reason of insanity (NGRI) defense, but that the defendant "would qualify for a guilty but mentally ill plea." Counsel then added the following:

> "We had numerous conversations with [the defendant] about that, basically with the understanding that the only way to get to the guilty but mentally ill plea part of it is *** in essence to admit your actions in the role. It was always his claim that he was innocent of the charges, and that it was not him on that day, therefore, we did not think it prudent to go forward with that type of defense."

¶ 42 Thereafter, Judge Hitzemann thoroughly reviewed the rest of the defendant's allegations with the defendant, giving the defendant the opportunity to add details or further explain the allegations. With regard to the defendant's claim that his counsel "didn't say anything about [his] mental status," the defendant explained that in that claim, "I was saying that they didn't say anything about my meds because I had been on meds, like, a long time and stuff like that, and it was kind of playing a role into me not being coherent and be able to respond and stuff like that." He added, "And I was off my meds." Judge Hitzemann then stated, "so you would have had them mention something about your meds during the course of the trial to the jury?" The defendant responded, "They were trying to say that my *** mental health condition isn't legit, and they wouldn't let me testify to clear my name or nothing." He added the following:

"And at the same time, I was kind of scared to testify, how all these guns was coming at me and stuff. It made me hard. I had realized that my counsel was against me. The prosecutor was against me. The judge, the jurors, the bailiff, everybody was against me, so they told me don't testify, and at the same [time,] I was scared to testify."

¶ 43 Judge Hitzemann thereafter indicated that he would ask more questions of the defendant's trial counsel. Of relevance to this appeal, he noted that there were concerns about the "defendant's behavior during trial or at the beginning of trial," and asked counsel "if there was any *** consideration or anything that had been made regarding raising an issue of fitness at that point?" Counsel testified as follows:

"[G]iven the different things that Dr. Cuneo had lamented in even the guilty but mentally ill NGRI report had to do with [the defendant] making things worse than they were medically show when we started the second trial and started to have some of these issues, we recessed. Over the course of that evening, Dr. Cuneo—I believe he did it through going over to the county jail. I don't think he did it on their video phone, but Dr. Cuneo did have

24

an opportunity to meet with [the defendant]. He then made a phone call with [co-counsel] and I, indicating to us that it was his belief that [the defendant] was still fit; and that it was basically some of the same underlying issues that we were seeing in the earlier evaluations."

Judge Hitzemann clarified that counsel was referring to the defendant's second trial. Counsel agreed that this is what he was referring to, then added:

"This happened at—we recessed I believe at some point in time on the first day. I think it was because we *** figured out that he may not have gotten his medication that morning, so we recessed, based—and that—Judge, actually that was one of the other reasons why we wanted Dr. Cuneo to go over there was because he hadn't gotten his medication that day[,] we knew that Dr. Cuneo would tell us if he thought there was a reason to—to hold up the trial."

The defendant then raised his hand, and when Judge Hitzemann allowed the defendant to speak, the defendant stated that he believed Dr. Cuneo was "a dirty doctor" who would do "whatever they tell him to do." When asked, the defendant stated that he did not remember speaking to Dr. Cuneo during the defendant's second trial, or to anyone else during that trial.

¶ 44    When questioned by Judge Hitzemann, counsel clarified that the date of the "initial NGRI" report from Dr. Cuneo was December 2, 2016. Judge Hitzemann thereafter stated that "obviously there was no NGRI defense based" upon Dr. Cuneo's report, and asked counsel if they had discussed self-defense with the defendant. Following that discussion, Judge Hitzemann discussed some of the defendant's other allegations with counsel. After again allowing the defendant to raise any other issues about the defendant's claims that the defendant wished to raise, Judge Hitzemann again discussed this court's previous order, and pronounced his findings.

¶ 45    Judge Hitzemann ruled, *inter alia*, that "many of the claims here that \*\*\* were made today and that have been previously made are the types of things that go to the trial strategy and the decisions that are left to an attorney to make." He added:

> "I think the last thing to deal with here is the issue of fitness and whether that the \*\*\* defendant's actions on the first day of trial and then thereafter constituted a reason that \*\*\* a *bona fide* doubt should have been raised for his fitness \*\*\* to stand trial. And a piece of information that we've learned here today that we hadn't previously known was that there was—I do find, based on what was said here today, that there was—Dr. Cuneo had been \*\*\* at least, consulted about what was going on. I understand through the NGRI defense and through other doctors that had previously seen and evaluated the defendant that there were some issues and some concerns about beleaguering [*sic*] and for failing to cooperate and purposely failing to cooperate.

> So, here today, I'm going to find that the defendant's claims were either without merit or were trial strategy, and I am going to dismiss the defendant's *pro se* petition here \*\*\* pursuant to *Krankel*."

Judge Hitzemann thereafter stated that Dr. Cuneo's December 2, 2016, NGRI report would be filed under seal, and would be available for review if needed. We have reviewed Dr. Cuneo's December 2, 2016, NGRI report, which consists of five typewritten pages and is now contained within the impounded record on appeal, and we find that its contents are consistent with the testimony about the report that was provided to Judge Hitzemann at the hearing by the defendant's trial counsel. In addition to the testimony about the report provided to Judge Hitzemann, we note that in the report, Dr. Cuneo mentioned Dr. Vallabhaneni's concern that the defendant was exaggerating his mental health symptoms to avoid trial, and noted that "[f]or the first 20 minutes

26

of" Dr. Cuneo's own evaluation of the defendant for the report, the defendant "played extremely mentally ill." Dr. Cuneo gave examples of the defendant's behavior, then added:

"Despite [the defendant's] attempt to play extremely mentally ill, his thinking itself was neither loose nor tangential as he could respond logically to questions when he chose to do so. I read to him his current charge and parts of the report from Dr. Vallabhaneni. I told him that I felt he was playing games with me as his psychiatric symptoms were not consistent and that I was going to leave. I told him the interview was over. He then asked if we could start over."

¶ 46    Dr. Cuneo noted that his mental status examination revealed that the defendant was "oriented in all three spheres—person, time, and place," and that the defendant "denied currently experiencing hallucinations," although "he did admit to experiencing them in the past when he was not taking his medication." Dr. Cuneo quoted the defendant as stating that the defendant was " 'not hearing voices on this medication,' " even though the defendant reported having hallucinations when "not on them." Dr. Cuneo contrasted his earlier examinations of the defendant, in December 2015 and January 2016, when the defendant reported hearing voices, noting that at present, "[n]o delusional material could currently be elicited in his thinking," and that the defendant's "thinking itself was neither loose nor tangential as he could logically and coherently respond to questions when he chose to do so." Dr. Cuneo noted that this was much different than at the earlier two examinations, when the defendant's "thinking had been extremely impoverished and there appeared to be thought blockage." Dr. Cuneo made other observations about the defendant's mental functioning, then noted that "[a]fter our confrontation as to [the defendant] playing extremely mentally ill, his affect was appropriate to the situation."

¶ 47    Dr. Cuneo thereafter noted that the defendant's mother had reported that the defendant became "extremely angry and irritable when he was not taking his psychotropic medication," and

that she stated that the defendant stopped taking his shots (which Dr. Cuneo characterized as "his psychotropic medication") around June 2015, and " 'got real negative, angry, cursing,' " and had memory problems. Dr. Cuneo recounted the defendant's history of dealing with his mental illness by self-medicating, and noted the defendant's history of numerous legal problems. He pointed out that the defendant had "been repeatedly noncompliant with his psychotropic medication, even in the prison setting, and was placed on enforced medication by the courts."

¶ 48    Dr. Cuneo listed the following as his diagnoses for the defendant based upon Dr. Cuneo's "evaluation to date": schizophrenia; cannabis use disorder, moderate, in a controlled environment; cocaine use disorder, moderate, in a controlled environment; phencyclidine use disorder, moderate, in a controlled environment; methamphetamine use disorder, moderate, in a controlled environment; opioid use disorder, moderate, in a controlled environment; alcohol use disorder, moderate, in a controlled environment; antisocial personality disorder; and borderline intellectual functioning. With regard to the charged offense, Dr. Cuneo noted, *inter alia*, that the defendant "denied that he was actively hearing voices or delusional at the time of the offense." Dr. Cuneo thereafter opined—as the defendant's counsel reported to Judge Hitzemann—that the defendant "was legally sane at the time of the alleged offense," but that he "would qualify for a guilty but mentally ill plea" because, *inter alia*, the defendant's "mental illness and his substance abuse played a major role in his actions at the time of the alleged offense."

¶ 49    Also on May 17, 2021, Judge Hitzemann entered his written order, in which he ruled that the defendant's *pro se* claims of ineffective assistance of counsel "lack merit or pertain only to matters of trial strategy," and that accordingly, the defendant was not entitled to relief. This timely appeal followed. Additional facts will be presented as necessary in the remainder of this order.

¶ 50                              II. ANALYSIS

¶ 51     On appeal, the defendant contends that (1) Judge Kelley erred when he found, on December 29, 2016, that the defendant had been restored to fitness; (2) during the defendant's second trial, in February 2018, Judge Kelley "erred in not ordering a new fitness evaluation after being informed that [the defendant] had not received his medications and was not communicating with counsel, and after witnessing his disruptive and self-destructive conduct during the trial"; (3) also during the defendant's second trial, the defendant "was denied the effective assistance of trial counsel, where counsel failed to raise the issue of [the defendant's] fitness during the trial and failed to preserve the issue *** after the trial"; and (4) on remand from this court's previous order, Judge Hitzemann "erred in dismissing [the defendant's] post-trial claim of ineffective assistance of counsel that implicated the fitness issue." As a preliminary matter, we note that the State contends that some of the "facts" in the defendant's opening brief are impermissibly argumentative or provide inappropriate commentary, and asks this court to strike them. However, we agree with the defendant's appellate counsel that the statements in question are more properly construed as attempts to make fact-based characterizations of documents or events found or depicted in the record on appeal, and do not represent impermissible argument or commentary. Accordingly, we decline to strike the statements. We note, however, that to the extent that there may be argumentative or otherwise inappropriate aspects to any of the statements, we will disregard said aspects and draw our own conclusions based upon our independent review of the relevant portions of the record on appeal.

¶ 52     We turn now to the merits of the defendant's claims. With regard to his claim that Judge Kelley erred when he found, on December 29, 2016, that the defendant had been restored to fitness, the defendant contends that Judge Kelley "summarily adopted the conclusion of Dr. Vallabhaneni that [the defendant] was fit to stand trial, based solely on the stipulations of counsel, apparently

29

without even reading Dr. Vallabhaneni's report, and without conducting any independent inquiry into [the defendant's] fitness whatsoever." The defendant acknowledges that this court will not reverse the circuit court's determination that a defendant is fit to stand trial unless that determination represents an abuse of the circuit court's discretion, which is a very deferential standard of review, but argues that in this case there was an abuse of discretion because Illinois precedent requires that the record show an affirmative exercise of judicial discretion regarding the fitness determination, which he claims is not present here.

¶ 53     In support of this contention, the defendant posits that the record suggests that at the December 29, 2016, status hearing at which Judge Kelley found that the defendant had been restored to fitness, Judge Kelley was handed Dr. Vallabhaneni's report just "moments" before making his ruling, which he contends further suggests that Judge Kelley never read Dr. Vallabhaneni's report, especially when his oral statement that he "would find that based upon the reports and stipulations that the defendant is fit to stand trial," is contrasted with his written statement, in his subsequent order, that "based on the stipulation," he found the defendant fit to stand trial. According to the defendant, Judge Kelley's failure to state that he read (and thereafter independently analyzed and evaluated) Dr. Vallabhaneni's report demonstrates an abuse of discretion. However, we agree with the State that because Judge Kelley clearly stated that he was basing his finding "upon the reports," as well as upon the stipulations, he was clearly indicating that he had read the reports, including Dr. Vallabhaneni's report. We decline to conclude that Judge Kelley would state that he was basing his finding in part on a report he had not read and evaluated, and further decline to conclude that the record does not show that Judge Kelley affirmatively exercised his judicial discretion when he made his ruling on this point.

¶ 54     We first note that although the defendant suggests the ruling came "moments" after Judge Kelley was handed Dr. Vallabhaneni's report, even if we were to assume, *arguendo*, that Judge

30

Kelley had not accessed Dr. Vallabhaneni's report prior to the hearing (despite its existence in the court file), there is no description in the transcript of the hearing regarding how much time passed between when the report was handed to Judge Kelley and when he ruled. We further note that it is not uncommon for a report of proceedings transcript—in the absence of a recess or some other noteworthy event, such as the beginning or ending of jury deliberations—to fail to describe the passage of time, especially in the context of how long a document is scrutinized by a witness, attorney, or judge, prior to that individual responding to the document. Moreover, a circuit court judge is presumed to know the law and apply it properly (see, *e.g.*, *People v. Baugh*, 358 Ill. App. 3d 718, 730 (2005)), which in this case would include the requirement that Judge Kelley read and analyze the report so that he could exercise his judicial discretion in making his ruling.

¶ 55    If it were clear from the record that Judge Kelley could not have done so in this case, we would agree with the defendant; however, notwithstanding the requirement that the record show an affirmative exercise of judicial discretion regarding a fitness determination, we decline to find that under the circumstances of this case, to comply with that requirement Judge Kelley was required to make an additional statement such as "I have now read and analyzed the document I am holding." Where, as here, the judge has stated that he is basing his determination in part on a report clearly in his immediate possession, we will presume—unless there is definitive evidence to the contrary—that he has read it and independently evaluated its contents.

¶ 56    We note as well that although we agree with the defendant that according to the record on appeal, this was the defendant's first appearance before Judge Kelley in this case—and therefore agree with the defendant that the State is incorrect when it suggests that Judge Kelley had ample prior opportunities to observe the defendant—nevertheless Judge Kelley certainly was able to observe the defendant at the hearing on December 29, 2016, and in our view the record reveals no behavior on the part of the defendant at the hearing that was disruptive, suggested disorientation,

31

or otherwise should have caused Judge Kelley to question or reassess his determination that the defendant had been restored to fitness and accordingly was fit for trial. Indeed, as described in detail above, and discussed in detail below, subsequent to Judge Kelley's December 29, 2016, determination of fitness, the first problematic behavior from the defendant did not arise until over a year later, at the defendant's second trial in February of 2018. As a result, we are not persuaded by the defendant's arguments in support of his first contention on appeal.

¶ 57    We turn therefore to the defendant's three remaining contentions of error, which we note are intertwined to the extent that each focuses on the events that transpired on the second and third days of the defendant's second jury trial: February 6, 2018, and February 7, 2018. The events of those days are described in detail above. In this appeal, the defendant's arguments related thereto are that (1) even if Judge Kelley "committed no error when [he] found [the defendant] fit on December 29, 2016, [he] should have suspended or continued the trial on February 6 or 7, 2018, in order to conduct a new fitness evaluation and hearing, after [the defendant] began repeatedly disrupting the proceedings, and [Judge Kelley] learned that [the defendant] had not been receiving his prescribed medications and was refusing to communicate with his attorneys," because a *bona fide* doubt existed as to the defendant's fitness at that time; (2) notwithstanding Judge Kelley's obligation to act on the *bona fide* doubt that existed as to the defendant's fitness at that time, the defendant's trial counsel provided ineffective assistance of counsel when they too failed to act on that *bona fide* doubt (specifically, when they failed to raise the issue and request a new fitness evaluation, and when they failed to preserve the issue for appeal); and (3) Judge Hitzemann "erred in dismissing [the defendant's] post-trial claim of ineffective assistance of counsel that implicated the fitness issue."

¶ 58    With regard to the final of these three contentions, we first commend Judge Hitzemann for his detailed, thorough, and patient handling of the defendant's second *Krankel* proceedings. As a

32

result of Judge Hitzemann's diligence related thereto, the vast majority of the defendant's *pro se* claims and related concerns now have been settled, including one of the concerns we noted in our previous order in this case. As described above, in that order, we noted that although at the defendant's first *Krankel* inquiry, the defendant told Judge McGlynn that the defendant was not allowed, at any point, to present an insanity defense or a guilty but mentally ill defense, Judge McGlynn did not follow up on this contention during his *Krankel* inquiry. See *Garrett*, 2021 IL App (5th) 180277-U, ¶ 40. Also as described above, we expressed additional related concerns about this, and ultimately noted that "[b]ecause of the manner in which the [first] *Krankel* inquiry unfolded, it remain[ed] unclear from the record if Dr. Cuneo ever produced [a report with regard to sanity at the time of the offense, and with regard to a guilty but mentally ill plea], and if so, whether the defendant's trial attorneys ever received the report, ever read the report, and ever considered formulating defenses on the basis of the report." *Id.* ¶¶ 41-42. As described above, as a result of the proceedings held by Judge Hitzemann, that question now has been definitively answered, and in this appeal, the defendant has not challenged anything related to that question, and has not challenged any of Judge Hitzemann's other rulings, with the exception of his ruling "that implicated the fitness issue."

¶ 59    Returning to that issue, we conclude that, unfortunately, Judge Hitzemann's best efforts notwithstanding, there remain troubling questions related to the fitness of the defendant on the second and third days of his trial: February 6, 2018, and February 7, 2018. As described above, in response to Judge Hitzemann's questions regarding this issue, the defendant's trial counsel testified as follows:

"[G]iven the different things that Dr. Cuneo had lamented in even the guilty but mentally ill NGRI report had to do with [the defendant] making things worse than they were medically show when we started the second trial and started to have some of these issues,

33

we recessed. Over the course of that evening, Dr. Cuneo—I believe he did it through going over to the county jail. I don't think he did it on their video phone, but Dr. Cuneo did have an opportunity to meet with [the defendant]. He then made a phone call with [co-counsel] and I, indicating to us that it was his belief that [the defendant] was still fit; and that it was basically some of the same underlying issues that we were seeing in the earlier evaluations."

Judge Hitzemann clarified that counsel was referring to the defendant's second trial. Counsel agreed that this is what he was referring to, then added:

"This happened at—we recessed I believe at some point in time on the first day. I think it was because we *** figured out that he may not have gotten his medication that morning, so we recessed, based—and that—Judge, actually that was one of the other reasons why we wanted Dr. Cuneo to go over there was because he hadn't gotten his medication that day[,] we knew that Dr. Cuneo would tell us if he thought there was a reason to—to hold up the trial."

¶ 60 For the reasons that follow, we conclude that the testimony provided to Judge Hitzemann by the defendant's trial counsel simply does not include the critical information necessary for this court—or any court—to rule on the defendant's remaining three contentions of error, including with regard to ineffective assistance of trial counsel, described in detail above. For example, trial counsel was unable to testify with certainty as to whether Dr. Cuneo even visited the defendant in person to evaluate him, or whether he did so over a video phone link. With regard to Dr. Cuneo's subsequent "belief"—as the defendant's trial counsel characterized it—that the defendant remained fit, counsel did not testify as to the level of certainty with which Dr. Cuneo expressed this "belief," or whether Dr. Cuneo stated that he would be willing to testify under oath as to this "belief" that the defendant was still fit. Counsel also described only vaguely his own understanding

34

of the reasons for Dr. Cuneo's "belief," stating "that it was basically some of the same underlying issues that we were seeing in the earlier evaluations."

¶ 61 Moreover, although counsel testified that "we *** figured out that he may not have gotten his medication that morning, so we recessed, based—and that—Judge, actually that was one of the other reasons why we wanted Dr. Cuneo to go over there was because he hadn't gotten his medication that day[,] we knew that Dr. Cuneo would tell us if he thought there was a reason to— to hold up the trial," counsel did not testify that anyone told Dr. Cuneo that the defendant had not been administered his medication that morning, or that Dr. Cuneo learned of this in some other way. This is significant, because although it is true, as the State argues in this appeal, that there existed some evidence from Dr. Vallabhaneni's reports that he believed the defendant may have been exaggerating, or even faking, his symptoms, and may not have needed to be on medication at all, Dr. Vallabhaneni was vague and equivocal about this, and never rendered a definitive opinion that this was the case. He also never altered the defendant's medications in accordance with such an opinion.

¶ 62 In contrast, in Dr. Cuneo's December 2, 2016, report—in which Dr. Cuneo discussed in detail Dr. Vallabhaneni's concerns, as well as Dr. Cuneo's own impressions with regard to this point—Dr. Cuneo painted a far more concrete, yet nuanced, picture of the defendant's mental fitness and its relationship to his medications. As described above, Dr. Cuneo's report made it clear that Dr. Cuneo believed that he could determine when the defendant was merely "attempt[ing] to play extremely mentally ill," because at such times the defendant's "thinking itself was neither loose nor tangential as he could respond logically to questions when he chose to do so." Dr. Cuneo noted that at that time, Dr. Cuneo's mental status examination revealed that the defendant was "oriented in all three spheres—person, time, and place," and that the defendant "denied currently experiencing hallucinations," although "he did admit to experiencing them in

the past when he was not taking his medication." Dr. Cuneo quoted the defendant as stating that the defendant was " 'not hearing voices on this medication,' " even though the defendant reported having hallucinations when "not on them."

¶ 63    Dr. Cuneo contrasted his earlier examinations of the defendant, in December 2015 and January 2016, when the defendant reported hearing voices, noting that at present, "[n]o delusional material could currently be elicited in his thinking," and that the defendant's "thinking itself was neither loose nor tangential as he could logically and coherently respond to questions when he chose to do so." Dr. Cuneo noted that this was much different than at the earlier two examinations, when the defendant's "thinking had been extremely impoverished and there appeared to be thought blockage." Dr. Cuneo thereafter noted that "[a]fter our confrontation as to [the defendant] playing extremely mentally ill, his affect was appropriate to the situation."

¶ 64    Dr. Cuneo also thereafter noted that the defendant's mother had reported that the defendant became "extremely angry and irritable when he was not taking his psychotropic medication," and that she stated that the defendant stopped taking his shots (which Dr. Cuneo characterized as "his psychotropic medication") around June 2015, and " 'got real negative, angry, cursing,' " and had memory problems. Dr. Cuneo recounted the defendant's history of dealing with his mental illness by self-medicating, noted the defendant's history of numerous legal problems, and pointed out that the defendant had "been repeatedly noncompliant with his psychotropic medication, even in the prison setting, and was placed on enforced medication by the courts." Ultimately, Dr. Cuneo continued to include schizophrenia as one of his diagnoses for the defendant based upon Dr. Cuneo's "evaluation to date."

¶ 65    Accordingly, based upon the opinions Dr. Cuneo previously expressed about the defendant, it is reasonable to conclude that if Dr. Cuneo believed the defendant was medication-compliant when the defendant began disrupting his trial on February 6, 2018, Dr. Cuneo might well have

36

found the defendant to be fit but malingering on that date, whereas if he had known the defendant was not medication-compliant, he might have found the defendant had lapsed again into unfitness. Indeed, not only did Dr. Cuneo—unlike Dr. Vallabhaneni—not question the reality of the defendant's prior unfitness when the defendant was not medicated, Dr. Cuneo, as explained above, is the doctor who initially found the defendant to be unfit in this case, noting in his January 18, 2016, report that the defendant was "presently unfit to stand trial," but that if the defendant "were provided with a course of inpatient psychiatric treatment *and stabilized on psychotropic medication*" (emphasis added), there then existed "a substantial probability that [the defendant] would be able to attain fitness within the course of one year."

¶ 66     In addition to the foregoing problems with the testimony provided to Judge Hitzemann by the defendant's trial counsel, even if we were to assume, *arguendo*, that Dr. Cuneo was told, or otherwise learned, that the defendant was not administered his medication on the second day of his trial, there exists no testimony that Dr. Cuneo was aware of what the defendant's medication consisted of in February 2018 (well over a year after Dr. Cuneo's last examination of the defendant), and in what doses, or that he opined in any way with regard to how his knowledge of the medications and doses impacted his "belief" that the defendant was still fit, possible concerns about "malingering" notwithstanding. Likewise, there exists no testimony with regard to whether Dr. Cuneo opined as to how the defendant missing his medication on the morning of the second day of his trial would impact the defendant on the third day of his trial if the defendant received the proper dose on the morning of the third day of the trial. This is significant in light of the fact that the defendant continued to be disruptive on the third day of his trial. If Dr. Cuneo had opined that this would not happen if the defendant took his third-day dose, it is clear that effective trial counsel, seeing the new disruptions, certainly would have been forced to question (and raise with Judge Kelley) the accuracy of Dr. Cuneo's opinion as to the defendant's fitness, if in fact that

37

opinion was based strictly on medication, not malingering. On top of that, as described above, Judge Kelley did not make a record with regard to whether the defendant received his medication on the third day of his trial, and the defendant's trial counsel provided no information to Judge Hitzemann with regard to that point either, although presumably counsel could have done so.

¶ 67    It is of course possible that Dr. Cuneo was fully aware of the medications, and doses thereof, that the defendant was not administered on the morning of February 6, 2018, and that he told the defendant's trial counsel that missing that medication, in those doses, on one morning would not cause the defendant to become unfit—or at least not cause him to become unfit as quickly as he allegedly did—and that therefore Dr. Cuneo's "belief" that the defendant remained fit was based upon Dr. Cuneo's belief that the defendant was exaggerating his symptoms and/or otherwise malingering. It is also possible that Dr. Cuneo determined that the defendant was malingering because, during his visit with the defendant on February 6, 2018, he determined, as he had on a previous occasion, that the defendant's "thinking itself was neither loose nor tangential as he could respond logically to questions when he chose to do so," and that therefore Dr. Cuneo believed that the defendant was again "attempt[ing] to play extremely mentally ill." However, there is at present no testimony in the record to support such possibilities, which means that at this point they are mere speculations.

¶ 68    We believe that it is possible that upon further questioning, the defendant's trial counsel could provide more precise testimony about what happened during the second and third days of the defendant's second trial, including with regard to Dr. Cuneo. We also believe it is possible that documentary evidence exists that would answer some or all of the foregoing questions, and/or that other witnesses with direct or indirect knowledge of these events could provide testimony and/or documentation to answer the questions necessary to rule on the defendant's fitness on February 6 and 7, 2018. That said, at this point this critical information is missing from the record, and we

38

decline the State's invitation to conclude that the information currently found in the record provides sufficient support for us to summarily deny the defendant's remaining three contentions of error.

¶ 69    For the foregoing reasons, we conclude that the proper remedy in this case is for this court to vacate Judge Hitzemann's order, and to remand this cause to the circuit court for a retrospective fitness hearing to determine if the defendant was fit to stand trial on February 6 and 7, 2018. See, *e.g.*, *People v. Payne*, 2018 IL App (3d) 160105, ¶ 14 (retrospective fitness hearings, once disfavored, now are appropriate if the court believes that the defendant's fitness to stand trial can be fairly and accurately determined on remand). If, following the retrospective fitness hearing, the circuit court concludes that the defendant's fitness on February 6 and 7, 2018, can be accurately assessed and confirmed, despite the passage of time, his conviction and sentence should be affirmed (see, *e.g.*, *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 38), because we conclude that if the defendant was in fact fit on those dates, none of the defendant's remaining three contentions of error rise to the level of error necessary to entitle him to a new trial or any other new proceedings. Under those circumstances, Judge Hitzemann's order that we are vacating also should be reentered by the circuit court, because it is otherwise unchallenged on appeal (see Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing)), and even if challenges to Judge Hitzemann's other findings had been made, they would not have succeeded, because Judge Hitzemann correctly dispensed with the remainder of the defendant's *pro se* ineffective assistance of counsel claims in his order.

¶ 70    If, on the other hand, the circuit court on remand determines that the evidence adduced by the parties on the issue of the defendant's fitness on February 6 and 7, 2018, is inconclusive, or

suggests that the defendant was not fit on February 6 and/or 7, 2018, then the defendant is entitled to a new trial on the basis of, *inter alia*, the arguments and authority cited by the defendant's appellate counsel in his briefs on appeal. See *Gipson*, 2015 IL App (1st) 122451, ¶ 38. Under those circumstances, it would not be appropriate for the circuit court to reenter Judge Hitzemann's order that we are vacating, because that order would be rendered moot by the decision that the defendant was tried when unfit and accordingly is entitled to a new trial on that basis.

¶ 71                                    III. CONCLUSION

¶ 72    For the foregoing reasons, we vacate Judge Hitzemann's order and remand this cause with directions that the circuit court conduct a retrospective fitness hearing to determine whether the defendant was fit on February 6 and 7, 2018.


¶ 73    Order vacated; cause remanded with directions.